

FILED
JAMES J. WALDRON, CLERK
FEB 2 6 2016
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____ DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>Global Protection USA, Inc.,<br><br>Debtor. | Case No.:  12-16322-ABA<br><br>Chapter:  7 |
| Andrew Sklar, Chapter 7 Trustee of the Bankruptcy Estate of Global Protection USA, Inc.,<br><br><div align="right">Plaintiff,</div><br><div align="center">v.</div><br>Susquehanna Bank,<br><br><div align="right">Defendant.</div> | Adv. No.:  12-1879-ABA<br><br>Judge:  Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

### INTRODUCTION

Before the court is an adversary proceeding of Andrew Sklar, Chapter 7 Trustee of the Bankruptcy Estate of Global Protection USA, Inc. (the "Trustee")[1] against Susquehanna Bank (the "Bank"), seeking avoidance of certain transfers. After four days of trial, including testimony and admission of documentary evidence, an Updated Joint Stipulation of Undisputed Facts and Witness Lists ("JS") (Doc. No. 120)[2] and post-trial memorandums from the parties, the proceeding is now ripe for consideration. The court concludes that all of the transfers may be avoided and recovered by the Trustee. The court denies the Trustee's request for attorney's fees and costs for this proceeding, but grants $2,000 as a sanction for the Bank's late production of its expert's report.

---

[1] The adversary proceeding was originally filed by the Official Committee of Unsecured Creditor in the Debtor's chapter 11 case. The Trustee substituted in as plaintiff upon the conversion of the Debtor's case to chapter 7.

[2] "Doc. No." refers to the docket of the adversary proceeding, Adv. Proc. No. 12-1879-ABA.

## JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. JS, ¶ 7. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). *Id.*, ¶ 9. Venue is proper in this Court pursuant to 28 U.S.C. § 1409. *Id.*, ¶ 10. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 547, 548, 549 and 550.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, the court issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT[3]

### A. The Parties

1. The Trustee is the duly appointed, qualified and acting trustee in the above-captioned case. The Trustee is prosecuting this action on behalf of the Debtor's bankruptcy estate. JS, ¶ 1.

2. At all relevant times, the Bank was a financial services institution headquartered at 26 North Cedar Street, Lititz, PA 17543-7000, but as of August 1, 2015, merged with Branch Banking and Trust Company, a North Carolina banking corporation. JS, ¶ 2.

3. Jane Homon was designated by the Bank as its Rule 30(b)(6) witness for the categories listed in the Rule 30(b)(6) notice dated October 18, 2013. JS, ¶ 32.

4. The Debtor, Global Protection USA, Inc., purports to be "a distributor of protective suits, respiratory masks, and a variety of equipment used for protection from the effects of nuclear, biological and chemical agents. [It] is located in Berlin, New Jersey[,] and sells its products to governmental agencies and commercial organizations throughout the world." Ex. T-68.

5. Steven Guarino ("Mr. Guarino") is the 100% owner of the Debtor. JS, ¶ 6; ex. T-9, p. 11.

---

[3] The court acknowledges that the Trustee is and may be pursuing other matters involving the facts alleged in this Adversary Proceeding. The Finding of Facts in this Adversary Proceeding are limited to this Adversary Proceeding and not binding on other non-parties to this litigation. *See In re Equity Land Title Agency, Inc.*, 370 B.R. 154, 159 (Bankr. S.D. Ohio 2007); *In re Roland*, 294 B.R. 244, 250 (Bankr. S.D.N.Y. 2003); *In re Schraiber*, 141 B.R. 1000, 1007 (Bankr. N.D. Ill. 1992). Moreover, the parties hereto have stipulated that the facts contained herein which are stipulated to are for use in this litigation and for no other purpose. *See JS.*

6. Mr. Guarino's brother, Thomas,[4] and Louis Schiliro worked for the Debtor. *See* ex. D-8; Tr-2[5] 10/26/15, 38-39.

## B. Procedural history

7. On March 12, 2012, the Debtor commenced its bankruptcy case by filing a voluntary petition under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code"). JS, ¶ 11.

8. Mr. Guarino asserted that the petition was filed because "too much debt and not enough money." Additionally, Mr. Guarino explained that certain monies were due to the Debtor and some vendors were no longer doing business with the Debtor. JS, ¶ 12 (quoting 341 Hearing Transcript at 9:10-12).

9. On March 12, 2012, the Debtor filed its schedules of assets and liabilities and its Statement of Financial Affairs (the "SOFA"). On April 2, 2012 and May 1, 2012, the Debtor amended its schedules. On April 2, 2012, the Debtor amended its SOFA. The schedules, SOFA and all amendments thereto were signed off on by Mr. Guarino. JS, ¶ 13.

10. On March 30, 2012, the Office of the United States Trustee held a formation meeting for an Official Committee of Unsecured Creditors ("Creditors' Committee") of the Debtor and appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. That same day, the Creditors' Committee selected Porzio, Bromberg & Newman, P.C. to serve as its counsel. JS, ¶ 14.

11. On August 29, 2012, the Creditors' Committee filed a complaint commencing the instant action against the Bank. Doc. No. 1; JS, ¶ 15.

12. On October 1, 2012, the Bank filed an answer to the complaint. On October 5, 2012, the Bank filed a first amendment to its answer to the complaint. Doc. Nos. 3, 6; JS, ¶ 16.

13. On October 12, 2012, the Debtor's bankruptcy case was converted from chapter 11 to chapter 7, and the Trustee was appointed. JS, ¶ 17.

14. On March 27, 2014, the Trustee, substituted in for the Creditors' Committee as plaintiff, filed an amended complaint against the Bank (the "Complaint") Doc. No. 20; JS, ¶ 18.

15. On April 11, 2014, the Bank filed an answer to the Complaint. Doc. No. 25. JS, ¶ 19.

16. In the Complaint, the Trustee seeks to recover from the Bank a $500,000 transfer made on December 13, 2011 (the "$500K Prepetition Transfer") and $655,000 in five postpetition

---

[4] Mr. Guarino's brother, Thomas, will be referred to in this opinion by his full name.

[5] Two transcripts of the trial held on October 26, 2015 were produced, one for the morning's testimony and one for the afternoon's. Thus citation will be to Tr-1 and Tr-2, respectively.

transfers (the "$655K Postpetition Transfers") received by the Bank, and be granted such other relief that the court deems just and equitable. JS, ¶ 20.

17. On May 30, 2014, the Bank filed a motion for partial summary judgment, seeking judgment in favor of the Bank on the count of the Trustee's Complaint that sought to avoid and recover from the Bank the $655K Postpetition Transfers. Doc. No. 35; JS, ¶ 22.

18. The Bank's motion for partial summary judgment was opposed by the Trustee, and was denied by an Order of the court dated July 17, 2014. Doc. No. 60. JS, ¶ 23.

19. On January 13, 2015, this court entered an Order Granting a Temporary Stay of the Adversary Proceeding until April 28, 2015. Doc. No. 86; JS, ¶ 24.

20. On May 15, 2015, this court entered an Order Regarding Temporary Stay Initially Imposed on January 13, 2015, temporarily continuing the stay of this action. Doc. No. 97; JS, ¶ 25.

21. On July 15, 2015, this court entered an Order Lifting Temporary Stay. Doc. No. 106; JS, ¶ 26.

## C. The Bank Line of Credit

22. Pursuant to a Loan and Security Agreement dated October 29, 2007 (the "Bank Line"), the Bank provided certain financing in the amount of $3,500,000 to the Debtor and Amerinova LLC ("Amerinova," to be described, below). JS, ¶¶ 3, 72; ex. D-4.

23. The Bank Line is personally guaranteed by Mr. Guarino and his wife, Kathleen Guarino ("Mrs. Guarino," and collectively, the "Guarinos"). JS, ¶ 6.

24. While the original maturity date of the note was July 31, 2008, ex. D-4 (§ 1.1.23), by an Amendment to Loan and Security Agreement and an Amended and Restated Revolving Credit Note, both dated June 30, 2010, the note was changed to a demand note. Ex. D-5.

25. The Bank Line provided that it was secured by all of the assets of the Debtor and Amerinova including all accounts receivable, license and contract rights, and inventory, together with all cash and non-cash proceeds thereof. The Bank Line "use of proceeds" provided that the proceeds shall be used to support short-term working capital obligations and for general business purposes. JS, ¶ 4; ex. D-4.

26. Prior to the bankruptcy filing, the Debtor would periodically make payments to pay down the Bank Line. JS, ¶ 5.

### D.  The Bank's Proofs of Claim

27. On July 25, 2012, the Bank filed a proof of claim asserting a secured claim against the Debtor in the principal amount of $1,704,436.62 as of March 12, 2012 (the "Bank's Claim") based on the amount owed on the Bank Line. JS, ¶ 27; Bankr. No. 12-16322-ABA claims register # 49-1.

28. The Bank's Claim against the Debtor was reduced by the $655K Postpetition Transfers it received on May 1, 2012 and June 11, 2012. JS, ¶ 28.

29. The Bank's Claim was further reduced by the Guarinos' payment to the Bank in the amount of $750,000 pursuant to a settlement agreement dated March 29, 2013 between the Bank and the Guarinos. JS, ¶ 29.

30. On December 10, 2013, the Bank amended its proof of claim against the Debtor to assert a claim of $299,436.62. JS, ¶ 30; Bankr. No. 12-16322-ABA claims register # 49-3.


### E.  The $500K Prepetition Transfer

31. The Guarinos had a $602,000 home equity line of credit with the Bank ("HELOC"), account number 1000639266. JS, ¶ 174; ex. D-27. The HELOC is dated March 26, 2009. Ex. D-27.

32. The HELOC was secured by a first mortgage on the Guarino's residence. JS, ¶ 175; ex. D-28.

33. Mr. Guarino testified that the purpose of the HELOC was for his wife to purchase a house in Florida. *See* Tr-2 10/26/15, p. 35.

34. Sometime in September 2011, the Bank suspended the Debtor's right to make further draws on the Bank Line. JS, ¶ 176.

35. On September 22, 2011, Mr. Guarino went to a branch of the Bank and arranged with branch personnel to debit $500,000 from the HELOC and to credit that amount to the Debtor's checking account, number 20001051109, also maintained at the Bank. JS, ¶¶ 177, 178. *See* Tr-2 10/26/15, pp. 31-32.

36. Mr. Guarino testified that he and his wife lent the company the money as a bridge loan until the credit line was restored and "the monies came in from California." Tr-2 10/26/15, p. 31.

37. In connection with the transfer, the Debtor executed and delivered a promissory note to the Guarinos, dated September 20, 2011. JS, ¶ 179, exs. T-4, D-8.

38. The promissory note provided, in part, the following:

Promissory Note 09/21/2011

$500,000

This note supersedes all Global Protection USA Inc.['s] existing or previous obligations. For value received, Global Protection USA INC [sic], a Delaware corporation, (company) promises to pay to the order of Stephen and Kathleen Guarino (payees) the principal amount of five hundred thousand dollars ($500,000.00) with interest of 10% thereon from the date hereof to the due date at the payable [sic] on or before December 15, 2011.

The Guarinos have agreed to borrow money from Susquehanna Bank to help the cash crunch of Global until money from the state of California toward the service contract arrives. This is an emergency loan to prevent the Bank from permanently freezing the credit line. This is a short term bridge loan and in no way should be construed as a capital contribution or an obligation of the Guarinos, as shareholders, to rectify or remedy the problems of Global Protection. This money is to be viewed as an extended line of credit from Susquehanna and the Guarinos, [sic] require, [sic] that, [sic] because it is a credit extension over and above what Susquehanna is willing to extend, it should be treated [as] a priority. Once a sizeable payment from the service agreement with California is received Global is obligated to pay this note.

Global Protection USA Inc. absolutely and unconditionally guarantees this note. Company Guarantees [sic] payment and there are no considerations or options for renewals or extensions. Global Protection USA Inc. pledges, as collateral for the loan, its rights to any and all assets, inventory, patents and possessions. All receivables from California state, county or municipal government agencies are included. . . .

Exs. T-4, D-8; JS, ¶ 180.

39. The note is signed by Mr. Guarino as President, Louis Schiliro as Director of Operations, and Thomas Guarino as Logistics Liaison. Ex. D-8.

40. When asked about the Debtor's negotiation of the Promissory Note, Mr. Guarino testified that the Debtor was "begging, give me money, give me money, that was the negotiation, save us." Tr-2 10/26/15, pp. 83-84.

41. This was the first time the Guarinos drew down on their HELOC for the purpose of providing a loan to the Debtor. JS, ¶ 181. Mr. Guarino testified that he believed it was the first time it was used for anything. Tr-2 10/26/15, p. 83.

42. On December 13, 2011, a deposit of $536,371.20 was made to the Debtor's bank account at the Bank, labelled "Stat TREAS 310 MISC PAY." Ex. T-12.

43. On December 13, 2011, the Debtor repaid the loan (the "$500,000 Prepetition Transfer") and the HELOC was paid down. JS, ¶ 182.

44. The repayment and paydown was accomplished by Mr. Guarino returning to the same branch of the Bank and arranging with branch personnel to debit $500,000 from the Debtor's checking account and to credit $500,000 to the HELOC. JS, ¶ 183. *See* Tr-2 10/26/15, p. 33.

45. The memo for the $500,000 debit from the Debtor's operating account with the Bank, and the memo for the $500,000 payment to the Guarinos' HELOC account maintained at the Bank, were processed by a teller at the bank branch at the same time: 11:04:53 on December 13, 2011. Those memos were further processed after the close of bank business on December 13, 2011. JS, ¶ 194.

46. Mr. Guarino testified that he had to repay the money to his and his wife's HELOC, rather than to their personal checking account, so that his wife would have the money to purchase a house in Florida. *See* Tr-2 10/26/15, pp. 34-35.

47. In February 2012, the Guarinos closed the HELOC and, as of February 25, 2013, the Bank cancelled of record the mortgage on their residence. JS, ¶ 184; ex. D-28.

48. The Guarinos were creditors of the Debtor at the time of the $500K Prepetition Transfer. JS, ¶ 187.

49. The $500K Prepetition Transfer was made for or on account of an antecedent debt owed by Debtor to the Guarinos before such transfer was made. JS, ¶ 188.

50. The $500K Prepetition Transfer was made on or within the 90 days prior to the Petition Date. JS, ¶ 189.

51. The $500K Prepetition Transfer enabled the Guarinos to receive more than they would have received under chapter 7 of the Bankruptcy Code. JS, ¶ 190.

52. The $500K Prepetition Transfer enabled the Guarinos to receive more than they would have received if the $500K Prepetition Transfer had not been made. JS, ¶ 192.

53. The $500K Prepetition Transfer enabled the Guarinos to receive more than they would have received if the Guarinos received payment of the debt relating to the $500K Prepetition Transfer to the extent provided by the Bankruptcy Code. JS, ¶ 193.

54. Postpetition the Bank did not extend any credit or new loans to the Debtor. JS, ¶ 195.

55. The Bank entered into evidence an Accountants Compilation Report ("Balance Sheet") purportedly prepared by William F. Hanlon for Global Protection Acquisition, Inc.,[6] estimating that assets exceeded liabilities by $1,546,289 for the nine months ending September 30, 2011. Ex. T-68.

56. The Balance Sheet showed a net income for the nine months ending September 30, 2011 of $10,965. Ex. T-68.

57. The Balance Sheet showed a negative "Net Cash Provided (Used) By Operating Activities" for the nine months ending September 30, 2011 of $1,044,339. Ex. T-68.

58. The Balance Sheet estimated inventory to be valued at $3,427,031. Ex. T-68.

59. The Notes to the Balance Sheet stated that the company recorded and valued inventory based on the first in, first out method ("FIFO"), using the lower of cost or market value ("LCM"). Ex. T-68.

60. Mr. Guarino testified that while the amount of inventory "fluctuated," it always had a "base inventory that was always on hand," and the Debtor always had "a couple of million dollars in inventory." Tr-2, p. 68.

61. The Debtor's Summary of Schedules disclosed that the Debtor's liabilities exceeded assets by $2.2 million on the petition date. Tr. 10/16/15, p. 111; ex. T-9, p. 16.[7]

62. The Debtor disclosed on its Amended SOFA that inventories, overseen by Louis Schiliro, were taken on January 31, 2012 and February 29, 2012, with the first estimating $2,629,271 of value and the second estimating $1,629,271 of value. Ex. T-54.

## F. The Cash Collateral Order

63. On April 1, 2012, the Debtor's counsel sent to the Creditors' Committee's counsel its proposed order granting use of cash collateral. Ex. D-33A.

64. On April 3, 2012, the Creditors' Committee's counsel replied to the Debtor's counsel regarding the proposed cash collateral order, raising issues that included that avoidance actions should be carved out from any Bank liens or superpriority claims and for the

---

[6] The summary of the "Nature of Business," provided as part of the balance sheet, ex. T-68, stated that on October 3, 2005, Global Protections Acquisition, Inc. acquired all of the assets and selected liabilities of Global Protection, LLC. The Debtor's petition states that it was formerly known as Global Protection Acquisition, Inc. Presumably, at some point after November 2, 2011 (the date of the balance sheet), the Debtor acquired Global Protection Acquisition, Inc.'s assets and liabilities, else this balance sheet does not relate to the Debtor. The Trustee did not object on this ground, thus the court will presume that the balance sheet reflects the Debtor's financial condition, not that of Global Protection Acquisition, Inc.

[7] The Summary of Schedules was testified to but not admitted into evidence. Exhibit T-9, p. 16, is Exhibit B, disclosing the Debtor's assets.

Debtor's and the Creditors' Committee's professionals, and asked whether the Bank intended to extend new credit or would the budget items be paid solely by the Debtor's accounts receivables. Ex. D-33A.

65. On April 4, 2012, the Debtor filed a Motion to Use Cash Collateral. Ex. T-14. Counsel for the Debtor and Counsel for the Bank signed this proposed cash collateral order as "approved in advance." *Id.*

66. On April 9, 2012, the Creditors' Committee filed a Certification in Support of the Debtor's Motion for Cash Collateral that attached a revised version of the proposed cash collateral order. Ex. D-33A. This order differed from the one submitted by the Debtor and approved by the Bank's counsel, including addition of paragraphs 2(i) and 6, concerning the carve outs mentioned in the April 3, 2012 email from the Creditors' Committee counsel to the Debtor's counsel, above (and to be discussed below. The filing included a blacklined copy comparing the Creditors' Committee version to the Debtor's version. Ex. D-33A.

67. The terms of the use of cash collateral were negotiated by and among counsel for the Debtor, Bank, Creditors' Committee and ILC Dover, LP ("ILC"). Mr. Guarino was present at the April 9, 2012 hearing regarding the use of cash collateral. JS, ¶ 43.

68. On April 9, 2012, this court granted the First Interim Order Authorizing Use of Cash Collateral in the form of order submitted by the Creditors' Committee on April 9, 2012. Ex. T-13; JS ¶ 33.

69. The First Interim Order Authorizing Use of Cash Collateral became a Final Order on May 10, 2012 (the "Cash Collateral Order"). JS, ¶ 33; ex. T-13.

70. The Cash Collateral Order, among other things, governed the Debtor's use of cash through the end of May 2012. JS, ¶ 34.

71. A detailed budget (the "Budget") was incorporated into the Cash Collateral Order, which Budget was annexed to the cash collateral motion. JS, ¶ 35; exs. T-14, T-15.

72. The Cash Collateral Order specified that "no expenses shall be paid or incurred by Debtor except for the expenditures set forth in the Budget and Carve Out Payments[.]" Ex. T-13, pp. 5-6.

73. The Budget included as line items: (i) income of monthly payments of $56,850 labelled "Service Contract – California," as well as (ii) expense for California monthly rent payments of $63,000. JS, ¶ 36; ex. T-15.

74. On April 9, 2012, counsel for the Debtor indicated on the record that a rent claim of RR&C Development Co. (the "California Landlord") was considered disputed and the Debtor had

not committed to pay that rent as of April 9, 2012 as an undisputed Budget item. JS, ¶ 37 (citing transcript of 4/9/12 Hearing, 32:4–15[8]).

75. Regarding the Debtor's payment of rent, Mr. Guarino testified that the State of California had notified Amerinova that it was not going to renew the storage contract in 2012. Therefore the Debtor looked into either downsizing by subleasing the existing space or finding a new tenant and going into a smaller space. Tr-2, p. 59, 62-63.

76. Despite considering the rent claim disputed, or otherwise intending not to pay for it, the Debtor did not submit a revised budget.

77. The first accounting issued by the Debtor after entry of the Cash Collateral Order showed that cost of goods sold exceeded the amount permitted under the Budget by over $130,000 and cash receipts were about $400,000 less than anticipated in the Budget. JS, ¶ 51. On April 27, 2012, the Bank filed a limited objection to the Cash Collateral Order, attaching that first accounting. JS, ¶ 52.

78. At the May 1, 2012 hearing on the Bank's objection, the Debtor, through counsel, confirmed that suppliers it needed to fill orders were refusing to do business with it. JS, ¶ 53 (citing transcript of May 1, 2012 hearing, 7:22-8:3 and 11:3-8, Bankr. No. 12-16322, Doc. No. 277).

79. Consistent with the discussions at the May 10th continued hearing on the objection, on May 16, 2012, the Debtor applied for leave of court to retain 321 Capital Partners "to investigate Debtor's inventory and assets and prepare them for market, to publish and communicate to others the opportunity for them to acquire Debtor's assets, to receive offers and to advise Debtor regarding sales." JS, ¶ 55 (quoting Doc. No. 64 at ¶ 5).

80. On or about June 7, 2012, consistent with the Cash Collateral Order and Budget, the Bank received an interest payment of $3,366.75 (check no. 1059) from the Debtor. JS, ¶ 56.

81. By order dated June 15, 2012, the terms of the Cash Collateral Order were extended to June 30, 2012 (the "Extension Order"). JS, ¶ 40.

82. The Bank did not object to the entry of the Extension Order. JS, ¶ 42.

83. The Debtor's authority to use cash collateral ceased after June 30, 2012. JS, ¶ 41.

84. Section C of the recitals of the Cash Collateral Order provides the following:

C. The Secured Creditor has, and Debtor has acknowledged and agreed that the Secured Creditor has, as of the Petition Date, a valid and subsisting first lien and security interest in all accounts receivable, license and contract rights, general

---

[8] The 4/9/12 transcript was not entered into evidence. To the extent that the parties referenced documents filed in this adversary proceeding or the main bankruptcy case in their JS, the court will accept the statements as stipulated facts without consulting the other parts of the documents referenced.

intangibles, plant furniture, machinery, equipment, inventory and all tangible and intangible personal property, together with all cash and non-cash proceeds thereof (the "Collateral") securing Debtor's indebtedness, in the principal amount of at least $1,704,436.62, together with accrued interest, fees and costs, which indebtedness is not subject to defense, offset or counterclaim of any kind or nature and that said debt is an allowed, fully secured claim under Sections 506(a) and 502 of the Bankruptcy Code. Said determination shall be binding upon the Debtor, but shall not bind the Committee or successor-in-interest to the Debtor, who shall have standing to . . . contest the scope, validity, perfection and/or amount of the Secured Creditor's Pre-Petition Debt and liens.

Ex. T-13, pp. 2-3.

85. The Cash Collateral Order defines "cash collateral" in the recitals as follows:

E. Cash Collateral. "Cash Collateral" as defined by Section 363(a) of the Bankruptcy Code includes post-petition proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in Section 552(h) [sic – should be 552(b)] and as the term "proceeds" is described in UCC Section 9306.

JS, ¶ 46; ex. T-13.

86. The Cash Collateral Order provided adequate protection to the Bank for the Debtor's use of cash collateral as follows:

2. As adequate protection for use of Cash Collateral, the Secured Creditor is GRANTED:

Replacement Lien. A replacement perfected security interest under Section 361(2) of the Bankruptcy Code to the extent and with the same priority in Debtor's post-petition collateral, and proceeds thereof, that the Secured Creditor held in Debtor's pre-petition collateral.

Statutory Rights Under Section 507(b). To the extent the adequate protection provided for hereby proves insufficient to protect the Secured Creditor's interest in and to the Cash Collateral, the Secured Creditor shall have a superpriority administrative expense claim, pursuant to Section 507(b) of the Bankruptcy Code, senior to any and all claims against Debtor under Section 507(a) of the Bankruptcy Code, whether in this proceeding or in any superseding proceeding, subject only to the Carve Out Payments, and such Section 507(b) claim is limited to the extent of any post-petition diminution in the Secured Creditor's interest in the collateral.

Deemed Perfected. The replacement lien and security interest granted herein is automatically deemed perfected upon entry of this Order without the necessity of

the Secured Creditor taking possession, filing financing statements, mortgages or other documents. . . .

JS, ¶ 47; ex. T-13.

87. Paragraph 2.i. of the Cash Collateral Order (the "Chapter 5 Provision") provides:

Notwithstanding any other provision included herein, no provision of this order shall be deemed to give the [Bank] a lien upon, or superpriority claim payable from, any claim held by the Debtor's estate under chapter 5 of the Bankruptcy Code, or the proceeds recovered from any claim held by the Debtor's estate under chapter 5 of the Bankruptcy Code.

JS, ¶ 44; ex. T-13.

88. The Cash Collateral Order includes a detailed, agreed-upon carve out provision addressing the conditions for a postpetition payment to the Bank not included in the Budget. (*For ease of reading, the court has divided one paragraph into several paragraphs.*)

6. Carve Out. Notwithstanding anything contained herein to the contrary, the pre and post-Petition Date liens, superpriority claims, replacement liens and adequate protection claims of any nature, are subordinate to the post-Petition Date payments that shall be made to the United States Trustee (the "Trustee Carve Out Payments"), the Court approved fees/expenses for the Debtor and Committee professionals (the "Professional Carve Out Payments"), and ILC in connection with the ILC Purchase Order in the aggregate amount of $924,876.00 (the "ILC Carve Out Payments," together with the Trustee Carve Out Payments and the Professional Carve Out Payments, the "Carve Out Payments").

The Debtor shall pay the ILC Carve Out Payments in advance and may pay in installments after which ILC shall ship a corresponding number of product units based on the ILC Purchase Order terms.

The Carve Out Payments are deemed a carve out of the [Bank]'s collateral. Additionally, the ILC Carve Out Payments are afforded superpriority administrative expense status pursuant to section 364(c)(1), provided however, ILC's superpriority claim is not payable from any claim held by the Debtor's estate under chapter 5 of the Bankruptcy Code, or the proceeds recovered from any claim held by the Debtor's estate under chapter 5 of the Bankruptcy Code.

Upon shipment of units by ILC in connection with the ILC Purchase Order, the corresponding ILC Carve Out Payments (two (2) payments identified in the Budget, each in the amount of $462,438) shall be deemed unavoidable and not subject to repayment or disgorgement under chapter 5 of the Bankruptcy Code, state law or otherwise.

In consideration of the Carve Out created herein, [Bank] shall be entitled to receive a payment not to exceed the sums on deposit in Debtor's general operating account on the Petition Date (i.e., $188,000) but made available to Debtor under this Order, when Debtor receives payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order, to be applied to the Pre-Petition Debt, provided, however, that the payment of less than or equal to $188,000 to the [Bank] under this paragraph shall be made only to the extent that the Debtor maintains at least $275,000 in available cash after (i) receiving full payment for the goods identified in the ILC Purchase Order, (ii) making payment or accruing for undisputed items approved for payment in the Budget, and (iii) making the payment to the [Bank] provided for herein, subject to a dollar-for-dollar reduction in the event Debtor has less than sufficient funds to maintain at least $275,000 in available cash. For example, if the Debtor has $400,000 in available cash after it receives payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order and payment of its undisputed obligations contained in the Budget, the [Bank] shall receive a payment in the amount of $125,000.

JS, ¶ 48; ex. T-13.

89. The Bank understood that paragraph 6: (1) entitled the Bank to "a" payment not to exceed $188,000 under certain conditions; (2) required $275,000 in available cash to be maintained; and (3) required full payment for the goods identified in the ILC Purchase Order. JS, ¶ 49.

**G.  Amerinova**

90. Amerinova was formed in 2007 as a California limited liability company and was also registered in New Jersey. JS, ¶¶ 57, 59.

91. Amerinova was originally owned in equal parts by Steven Guarino, Thomas Guarino, Jonathan Denker and Lou Schiliro. JS, ¶ 60; Tr-2, p. 53 (Mr. Guarino testimony that all four had 25 percent interest each). Mr. Guarino contends that he resigned from Amerinova at the end of 2010 or the beginning of 2011. Tr-2, p. 53.

92. The Debtor negotiated and secured a contract (the "CDPH Contract") with the California Department of Public Health ("CDPH"). JS, ¶ 58.

93. The CDPH Contract, executed in July 2008, was "put in the name of" Amerinova. JS, ¶ 59.

94. The CDPH Contract was essentially a storage contract. The Debtor secured space (the "California Warehouse Space"), which it subleased to Amerinova (the "Sublease"), to fulfill storage obligations to the CDPH under the CDPH Contract. JS, ¶ 63.

95. Amerinova was created (1) to protect the CDPH Contract because there was ongoing litigation with a specific party regarding the Debtor, and (2) to collect payment from the CDPH and turn it over to the Debtor through the Sublease. JS, ¶ 64.

96. Amerinova only collected money from the CDPH Contract and never expanded; there were no sales, no operations, and no other assets or revenue. Amerinova attempted to expand, but failed. JS, ¶ 65.

97. The Debtor's representative testified at the April 26, 2012 section 341 meeting of creditors: "First of all, there's no activity with Amerinova except that they exist to be able to collect that check from California. They don't do anything. So it's basically a defunct company that doesn't do anything." Transcript of 341 hearing before Jeffrey Sponder, Esquire, Office of the United States Trustee, 36:5-10, April 26, 2012. The parties are not stipulating as to what point in time the representative was referring to. JS, ¶ 66.

98. At the May 10, 2012 continued hearing on the Bank's limited objection to the proposed Cash Collateral Order, Debtor's counsel, Mr. Deiches, advised that "rent on the California facility is payable to the landlord at $63,000 per month." JS, ¶ 54 (citing transcript of May 10, 2012 hearing, 7:9-11).

99. Also at the May 10, 2012 hearing, Debtor's counsel advised "that during the past week the Bank received a pay down of its secured debt of $505,000 from a stream of three sources. I must be candid and say that the sources of that pay down are being reviewed by the Creditors' Committee's counsel and all rights and claims are reserved as to that." He later stated "the Committee just learned yesterday that there was over a $500,000 pay down to the Bank . . . the Committee reserves all of its rights with respect to those payments, as they seem to have been made possibly outside the language of the Cash Collateral Order initially and Code requirements. At the same time, with all the parties being in agreement that a quick liquidating plan needs to be put in place, these are issues that may very well work themselves out. So we could agree at this time that if the Cash Collateral Order's entered as a final order, it will help move this case along, and hopefully we [c]an be back here in a few weeks together on a liquidating plan that everybody agrees on." JS, ¶ 54 (citing transcript of May 10, 2012 hearing, 8:25-9:5, 11:14-21).

100.    The original lease between the Debtor and Amerinova called for rental payments of $80,000 per month from February 1, 2008 through January 31, 2010. Ex. T-33.

101.    The Debtor and Amerinova entered into an addendum to the lease that provided for rental payments of $88,000 for February 1, 2011 through January 31, 2012, and of $92,400 for February 1, 2012 through January 31, 2012 [sic; it is assumed that the parties meant January 31, 2013]. Ex. T-34.

102.    The parties did not put into evidence what rent Amerinova charged the CDPH.

103.   By letter dated January 21, 2012 from Mr. Guarino to Jack Denker, the Debtor amended the lease addendum to charge Amerinova only $56,850 per month. JS, ¶ 67; ex. T-35.

104.   In another letter from Mr. Guarino to Jack Denker, president of Amerinova, also dated January 21, 2012, Mr. Guarino stated the following, in pertinent part:

> I would ask that [rent collected by Amerinova from CDPH for the storage of the 3M masks] or any other funds collected from past CDPH obligations be paid to Global. However in the event of Global's insolvency or inability to pay its CA lease obligations then all money will be paid directly to Susquehanna Bank and asked to be directed to pay down the credit line to which both Global Protection and Amerinova are obligated. You and Amerinova have no obligation to Global except for these conditions.

Ex. D-36.

105.   Mr. Guarino testified that he wrote this letter because in January "everything turned sideways. And at that time the thought of what direction Global was going to go or could go and what the options were became, for the best, confusing. So at that point I instructed Mr. Denker that any payments that are owed on the rent should go directly to Susquehanna Bank.

Tr-2, p. 56.

106.   In the Debtor's bankruptcy case, the California Landlord filed a Motion to Compel Immediate Payment of Post-Petition Rent and Other Post-Petition Lease Obligations Owed Under the Lease Pursuant to 11 U.S.C. § 365(d)(3) and to Compel Immediate Rejection of the Lease and Surrender of Premises. On August 20, 2012, the California Landlord and the Debtor entered into a Consent Order resolving this motion that the court granted. JS, ¶ 100 (citing Order dated August 20, 2012, Doc. No. 118).

107.   The California Landlord received a stipulated allowed, administrative claim of $169,569.85 for unpaid postpetition rent and related charges. JS, ¶ 100 (citing Order dated August 20, 2012, Doc. No. 118); T-21.

108.   The Debtor's Budget incorporated into the Cash Collateral Order included a revenue line item for monthly payments of $56,850 from March 2012 through July 2012. Postpetition, the Debtor received from Amerinova one check for $56,850, dated March 27, 2012. JS, ¶ 68; exs. T-15, T-36.

109.   Postpetition, the Bank received two payments totaling $150,000 from Amerinova with instructions to apply those payments to the Debtor's loan, and it applied them as instructed. JS, ¶ 70.

110.    The $100,000 check issued by Amerinova to the Bank bears the note "for Global Protection" and the $50,000 check bears the note "line pay-down." JS, ¶ 71; exs. T-31, T-32.

111.    Mr. Guarino believed that Amerinova never made payments to the Bank prior to the bankruptcy filing, only the Debtor did. Guarino Dep. 6/7/2012 182:17-22; JS, ¶ 73.

112.    Mr. Guarino believed that the May 1st $100k Amerinova Transfer (defined below) by Amerinova was the first time Amerinova ever paid funds to the Bank. Guarino Dep. 6/7/2012 182:17-22. JS, ¶ 74.

113.    The Bank introduced at trial copies of checking/money market debit slips purporting to show that Amerinova made payments directly on the Line of Credit prior to 2012. Ex. D-39. *See* Tr-1 10/26/15, pp. 44-45 (Jane Homan testimony regarding the debit slips).

114.    Those payments were $145,000 on March 26, 2006 [sic]; $120,000 on February 19, 2009; $30,000 on March 24, 2009; and $100,000 on June 30, 2009. Ex. D-39.

115.    The bank statement for the Line of Credit shows payments of $120,000 and $30,000 on February 19, 2009 and March 24, 2009, but not the $145,000 or $100,000 payments on the corresponding dates. Ex. D-1. There is a payment of $145,000 on March 26, 2009 (not 2006), and a payment of $500,000 (not $100,000) on June 30, 2009. Ex. D-1.

## H. Discount Central

116.    Discount Central LLC ("Discount Central") is a New Jersey limited liability company. JS, ¶ 75.

117.    Prior to the Petition Date, the Debtor paid Discount Central certain funds in connection with a purchase of computer tablets, which was reflected on Schedule B of the Debtor's petition as an asset of the Debtor. JS, ¶ 77.

118.    Specifically, Schedule B under "Inventory" reflects, among other things, "additional items in transit from China purchased 8March2012 [sic] for $348,600." JS, ¶ 78.

119.    The Debtor drew down $348,600 on the Bank Line on March 8, 2012. JS, ¶ 79.

120.    To purchase the tablets, the Debtor wired $348,600 out of its operating account. JS, ¶ 80.

121.    Mr. Guarino then cancelled a portion of the order and directed that the refund in the amount of $205,000 be transferred to the Bank. JS, ¶ 81 (citing Guarino CC Certification, Case No. 12-16322, Doc. No. 185 at ¶ 17, where he describes the $205K May 1, 2012

Payment as "a refund of the deposit from Discount Central"; Transcript of Guarino Dep. June 7, 2012: "Q. Did you have to do anything further than just request cancellation of the order to have Discount Central agree to return this money? A. Cancel the Order. Got the money back. There was no strings attached, no side deals, no nothing.").

122.     Discount Central made a payment to the Bank of $205,000. JS, ¶ 82.

123.     The check issued by Discount Central bears the note "for Global Protection." JS, ¶ 83.

124.     Discount Central owed no obligations to the Bank. JS, ¶ 85.


## I.    The $655K Postpetition Transfers[9] to the Bank

125.     On May 1, 2012, the Bank received a $200,000 transfer of property of the estate from the Debtor via check no. 1034 (the "May 1st $200k Debtor Transfer"), a $205,000 transfer of property by Discount Central LLC to the Bank via check no. 136 (the "May 1st $205k Discount Central Transfer") and a $100,000 transfer of property by Amerinova to the Bank via check no. 107 (the "May 1st $100k Amerinova Transfer"). JS, ¶ 87.

126.     On May 1, 2012, the Bank applied the $505,000 to principal, reducing the Bank's Claim to $1,199,436.62. JS, ¶ 88.

127.     There was no order of the Bankruptcy Court before or after May 1, 2012 authorizing the Bank to pay down the Bank Line by $505,000 on May 1, 2012 with Debtor assets. JS, ¶ 89.

128.     Mr. Guarino alerted the Bank's counsel via email on May 2, 2012 "that $505,000.00 was deposited into the Global Protection credit line account on Tuesday May 1st. Please have someone acknowledge the credit." Ex. T-47.

129.     Regarding the May 1st $200K Debtor Transfer, the Bank through its counsel stated via email on May 4, 2012 to Debtor's counsel, that "I am concerned about the Global Protection check. The CC order only expressly mentions repayment after the ILC Dover transaction is completed and then only of the seed money from the Susquehanna account." Ex. T-47.

130.     On June 11, 2012, the Bank received a $100,000 transfer of property of the estate by the Debtor to the Bank via check no. 1060 (the "June 11th $100k Debtor Transfer"), and another $50,000 transfer of property by Amerinova to the Bank via check no. 109 (the "June 11th $50k Amerinova Transfer"). JS, ¶ 91.

---

[9] All postpetition transfers to the Bank will be collectively defined as the "$655K Postpetition Transfers".

131.     On June 11, 2012, the Bank applied the $150,000 payment from the Debtor and Amerinova to the Bank Line, reducing its prepetition debt to $1,049,436.62. JS, ¶ 92.

132.     There was no order of the Bankruptcy Court before or after June 11, 2012 authorizing the Bank to pay down the Bank's Claim by $150,000 on June 11, 2012 with Debtor assets. JS, ¶ 93.

133.     In light of the $655K Postpetition Transfers, the Defendant received more than "a payment" from the Debtor postpetition. JS, ¶ 97.

134.     In light of the $655K Postpetition Transfers, the Defendant received more than "a payment" on account of its claim against the Debtor postpetition. JS, ¶ 98.

135.     After the Petition Date, the Bank received payments from the Debtor and applied those payments against the Bank's Claim in an amount in excess of the sums on deposit in Debtor's general operating account on the Petition Date (i.e. $188,000). JS, ¶ 99.

### 1. May 1st $200k Debtor Transfer to the Bank

136.     The May 1st $200k Debtor Transfer was a transfer of property of the estate. JS, ¶ 101.

137.     The Defendant was the initial transferee of the May 1st $200k Debtor Transfer. JS, ¶ 102.

138.     Mr. Guarino and Thomas Guarino testified that Thomas Guarino signed the check for the May 1st $200k Debtor Transfer. JS, ¶ 103 (citing Thomas Guarino Dep. 25:10-12 and Stephen Guarino Dep. 11/23/2013 39:4-8).

139. The Debtor had not received payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order at the time of the May 1st $200k Debtor Transfer. JS, ¶ 107.

140. The May 1st $200k Debtor Transfer was applied by the Bank to the Bank's prepetition claim. JS, ¶ 114.

141. The May 1st $200k Debtor Transfer was not authorized by court order. JS, ¶ 115.

### 2. May 1st $205k Discount Central Transfer

142. The Trustee contends that the May 1st $205k Discount Central Transfer was a transfer of property of the estate, but the Bank disputes this contention. JS, ¶ 116.

143. The Bank was the initial transferee of the May 1st $205k Discount Central Transfer. JS, ¶ 117.

144. The Debtor did not receive payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order at the time of the May 1st $205k Discount Central Transfer. JS, ¶ 123.

145. The May 1st $205k Discount Central Transfer was applied by the Bank to the Bank's prepetition claim. JS, ¶ 129.

146. The May 1st $205k Discount Central Transfer was not authorized by court order. JS, ¶ 130.

### 3. May 1st $100k Amerinova Transfer

147. The Trustee contends that the May 1st $100k Amerinova Transfer was a transfer of property of the estate, but the Bank disputes this contention. JS, ¶ 131.

148. The Defendant was the initial transferee of the May 1st $100k Amerinova Transfer. JS, ¶ 132.

149. The Debtor had not received payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order as of the May 1st $100k Amerinova Transfer. JS, ¶ 134.

150. The May 1st $100k Amerinova Transfer was applied by the Bank to the Bank's prepetition claim. JS, ¶ 140.

151. The May 1st $100k Amerinova Transfer was not authorized by court order. JS, ¶ 141.

### 4. The June 11th Transfers

152. The Debtor received the final portion of payment for the goods identified in the ILC Purchase Order on or about May 25, 2012. JS, ¶ 169.

### a. $100k Debtor Transfer

153. The June 11th $100k Debtor Transfer to the Bank was a transfer of property of the estate. JS, ¶ 142.

154. The Defendant is the initial transferee of the June 11th $100k Debtor Transfer. JS, ¶ 143.

155. Mr. Guarino and Thomas Guarino testified that Thomas Guarino signed the check for the June 11th $100k Debtor Transfer. JS, ¶ 144 (citing Thomas Guarino Dep. 28:17-18 and Stephen Guarino Dep. 11/23/2013 50:25-51:1).

156. At the time of the June 11th $100k Debtor Transfer, the Debtor did not have at least $275,000 in its bank accounts, after making payments for or accruing for undisputed items approved for payment in the Budget. JS, ¶ 152 (citing MOR for June 2012, Doc. No. 97).

157. The Bank put the June 11th $100k Debtor Transfer in a "suspense account" because it was concerned the payment may not have met the conditions of the Cash Collateral Order. JS, ¶ 155.

158. The June 11th $100k Debtor Transfer was applied by the Bank to the Bank's prepetition claim. JS, ¶ 156.

159. The June 11th $100k Debtor Transfer was not authorized by court order. JS, ¶ 157.

### b. June 11th $50k Amerinova Transfer

160. The Trustee contends that the June 11th $50k Amerinova Transfer was a transfer of property of the estate, but the Bank disputes this contention. JS, ¶ 158.

161. The Bank was the initial transferee of the June 11th $50k Amerinova Transfer. JS, ¶ 159.

162. At the time of the June 11th $50k Amerinova Transfer, the Debtor did not maintain at least $275,000 in its bank accounts after making payments for or accruing for undisputed items approved for payment in the Budget. JS, ¶ 163 (citing MOR, Doc. No. 97).

163. The June 11th $50k Amerinova Transfer was applied by the Bank to the Bank's prepetition claim. JS, ¶ 166.

164. The June 11th $50k Amerinova Transfer was not authorized by court order. JS, ¶ 167.

### CONCLUSIONS OF LAW

1. The Trustee is not precluded from avoiding transfers to the Bank on account of the Bank's secured or superpriority status because the Bank agreed in the cash collateral order that its security interest did not extend to funds recovered under Chapter 5 of the Bankruptcy Code.

2. The $500K Prepetition Transfer was to or for the benefit of the Bank.

3. The $500K Prepetition Transfer was for or on account of an antecedent debt owed by the Debtor before such transfer was made.

4. The Debtor was insolvent when the $500K Prepetition Transfer was made.

5. The $500K Prepetition Transfer was made on or within 90 days before the date of the filing of the petition.

6. The $500K Prepetition Transfer enabled the Bank to receive more than it would have received if the case were a case under chapter 7, the transfer had not been made, and the Bank had received payment of the Bank's Claim to the extent provided by the provisions of the Bankruptcy Code.

7. The $500K Prepetition Transfer was not incurred by the Debtor in the ordinary course of its business and financial affairs, and was made in the ordinary course of business or financial affairs of the Debtor.

8. The Bank was the initial transferee of the $500K Prepetition Transfer.

9. The May 1st $200K Debtor Transfer was not authorized by the Bankruptcy Code or the Cash Collateral Order.

10. The May 1st $100K Amerinova Transfer was not authorized by the Bankruptcy Code or the Cash Collateral Order.

11. The May 1st $205K Discount Central Transfer was not authorized by the Bankruptcy Code or the Cash Collateral Order.

12. The June 11th $150K Debtor Transfer was not authorized by the Bankruptcy Code or the Cash Collateral Order.

13. The June 11th $50K Amerinova Transfer was not authorized by the Bankruptcy Code or the Cash Collateral Order.

14. The Amerinova transfers were transfers of property of the estate.

15. The Discount Central transfer was a transfer of property of the estate.

16. The Trustee is entitled to attorney's fees for the Bank's late filing of its expert report.

17. The Trustee is not entitled to attorney's fees for bringing this adversary proceeding.

## ANALYSIS

Before reviewing the various transfers, the court will address the Bank's argument that its secured status precludes any recovery of avoided transfers to it.

### A.    Effect of the Cash Collateral Order Carve Out on the Trustee's Claims

The Cash Collateral Order in paragraph 2(a) provides the Bank with a replacement lien on postpetition collateral as adequate protection. To the extent that this adequate protection is insufficient, it grants the Bank a superpriority administrative expense claim, subject only to the Carve Out Payments defined in paragraph 6. The Carve Out Payments consist of payments to the United States Trustee, court-approved fees and expenses for the Debtor and Creditors' Committee professionals, and payments to ILC Dover, LP in connection with the ILC purchase order. The Cash Collateral Order also recognized the Bank's existing, prepetition secured claim in the principal amount of $1,704,436.62. Recitals, ¶ C.

Section 502(h) provides that:

"[a] claim arising from the recovery of property under section . . . 550 . . . of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."

11 U.S.C. § 502(h). Therefore, when a trustee recovers funds pursuant to section 550, the entity recovered from can assert a claim in that amount, which the Bankruptcy Code deems a prepetition claim. A section 502(h) claim takes the character of the creditor's original claim, so if it was a secured claim prepetition, then this "replacement claim" for the avoided transfer will also be a secured claim. *See Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.),* 375 F.3d 51, 67 (1st Cir. 2004). "It is Fleet's status as a secured creditor at that time, not later, that determines the nature of its present 502(h) claim." *Id.,* at 68.

Courts have held that where the section 502(h) claim is secured, it is "futile . . . to order recovery of an unauthorized post-petition transfer from a secured creditor since the creditor's lien would be revived by the avoidance." In *Rushton v. Bank of Utah (In re C.W. Min. Co.),* 477 B.R. 176, 186 (B.A.P. 10th Cir. 2012) (citing decisions from the Fourth Circuit Courts of Appeal, and the bankruptcy courts of Vermont, the Western District of Texas, and Massachusetts), *aff'd, Jubber v. Bank of Utah (In re C.W. Mining Co.),* 749 F.3d 895 (10th Cir. 2014).

But here, paragraph 2(i) of the Cash Collateral Order overrides the operation of section 502(h). It provides as follows:

> Notwithstanding any other provision included herein, no provision of this order shall be deemed to give the [Bank] a lien upon, or superpriority claim payable from, *any claim* held by the Debtor's estate under chapter 5 of the Bankruptcy Code, or the proceeds recovered from *any claim* held by the Debtor's estate under chapter 5 of the Bankruptcy Code.

JS, ¶ 44; ex. T-13 (emphasis added).

The Bank complains that paragraph 2(i) of the Cash Collateral Order was not discussed during negotiations. Defendant's Proposed Findings of Fact, Doc. No. 124, ¶¶ 54-55, 112-113. It also cites paragraph C of the recitals as preserving its section 502(h) rights. It asserts that therefore paragraph 2(i) must be read as applying only to avoidance actions against third parties, not the Bank. The Trustee disputes this contention.

When it comes to cash collateral orders, "[u]nless it conflicts with provisions of the Bankruptcy Code, a carve out is construed applying normal contract interpretation provisions." *In re Residential Capital, LLC*, 501 B.R. 549, 621 (Bankr. S.D.N.Y. 2013). Thus, where terms of a contract are clear and unambiguous, the court is to understand them in their "plain, ordinary and popular sense." *U.S. Fid. & Guar. Co. v. Guenther*, 281 U.S. 34, 37 (1930) (quoting *Imperial Fire Insurance Co. v. Coos County*, 151 U. S. 452, 462 (1894)); *Spano v. JP Morgan Chase Bank, NA*, 521 Fed. Appx. 66, 70 (3d Cir. 2013) ("'[W]here the terms of a contract are clear and unambiguous[,] there is no room for interpretation or construction and courts must enforce those terms as written.'") (quoting *Impink ex rel. Baldi v. Reynes*, 396 N.J. Super. 553, 935 A.2d 808, 812 (2007); *Howard Johnson Int'l, Inc. v. MAC (USA) Trade, Inc.*, CIV 06-5588(WJM), 2008 WL 5046834, at *4 (D.N.J. Nov. 21, 2008) (where intent can be "cleanly extracted from the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are held to those words contained in the contract.'") (quoting *Compass Tech. v. Tseng Lab.*, 71 F.3d 1125, 1131 (3d Cir. 1995)). Accordingly, this court will invoke normal contract interpretation principles in analyzing the Cash Collateral Order.

The court rejects the Bank's argument that paragraph 2(i) only encompasses recovery of chapter 5 transfers from entities other than the Bank. The express language "*any claim* held by the Debtor's estate" and "proceeds recovered from *any claim*" is not limiting or unclear. The court notes that the same language is repeated in paragraph six regarding the carve out for ILC's superpriority claim. The Bank's averment that paragraph 2(i) was not discussed during the negotiations of the order is not grounds to invalidate it now. If the Bank had a problem with the entered order, it had plenty of time file a motion alleging that the order did not reflect the parties' understanding. The court will not consider such an objection now.

Moreover, while the Bank is correct that its claim will "spring back" by the same amount recovered (since those transfers paid down its prepetition claim), the clear and unambiguous language of paragraph 2(i) prevents that claim from encompassing the recovered funds. In other words, if the Trustee recovers the entire $655,000, he will pay claims with it in the order of priority but not the Bank's prepetition secured claim. Similarly, if the Trustee recovers $500,000 as a preference payment, the Bank's prepetition lien will not embrace these funds. Nor will the funds be used to pay the Bank's superpriority claim, if its collateral runs out. *See Aalfs v. Wirum (In re*

*Straightline Investments, Inc.),* 525 F.3d 870, 884 (9th Cir. 2008) (refusing recoupment where court order prohibited debtor from obtaining postpetition loans secured by its accounts receivable); *Martino v. First Nat'l Bank (In re Garofalo's Finer Foods, Inc.),* 164 B.R. 955, 968 (Bankr. N.D. Ill. 1994) (granting trustee's section 549 claim against bank that accepted postpetition payment for overdrafts in violation of section 364, and rejecting bank's "net result" argument), *aff'd in relevant part, rev'd in part on other grnds,* 186 B.R. 414 (N.D. Ill. 1995).

Accordingly, the Trustee's avoidance actions asserted in this complaint are not asserted in vain. If successful, he may recover the funds on behalf of the estate and distribute them according to the priorities of the Bankruptcy Code, subject to the limitations of paragraph 2(i) of the Cash Collateral Order.

### B.    First Count —Avoidance of Preferential Transfer

The Trustee seeks to recover as a preferential transfer from the Bank the $500,000 Prepetition Transfer that the Debtor paid to the Guarinos on December 13, 2011. Section 547 provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
        (A) on or within 90 days before the date of the filing of the petition;
or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Section 550 permits the trustee to seek to recover the transfer from an initial transferee, an entity for whose benefit the transfer is made, or any immediate or mediate transferee of the initial transferee. 11 U.S.C. § 550(a).

"Congress' intent in enacting section 547(b) was to promote equal distribution among a bankrupt's creditors. *In re Del Grosso,* 89 B 06606, 1992 WL 280788, at *5 (Bankr. N.D. Ill. Sept.

21, 1992) (citing H.R. Rep. No. 95–959, 95th Cong., 1st Sess. 178 (1977), *reprinted in* 5 U.S. Code Cong. & Admin. News 6138 (1978)).

The plaintiff has the burden of proving the avoidability of a preference, and the defendant has the burden of proving any defenses, each by a preponderance of the evidence. 11 U.S.C. § 547(g); *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999); *Wilen v. Pamparo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152, 174 (Bankr. D.N.J. 2010).

At trial, the Bank conceded that all elements of a preferential transfer were satisfied except for whether the Debtor was insolvent at the time of the transfer. *See* Tr. 10/15/15, 68:25-69:2. Should the court determine that the Debtor was insolvent, then the Bank asserts the defenses that the payment was made in the ordinary course of business, that the Trustee had to first avoid the payment as to the Guarinos, and that the Trustee cannot recover the payment from the Bank because it was a fully secured creditor. Doc. No. 124, p. 15. Additionally, it argued that it was an immediate or mediate transferee that took for value, in good faith, and without knowledge of the voidability of the transfer avoided. Doc. No. 124, pp. 20-21.

## 1.    Presumption of Insolvency

The Bankruptcy Code defines insolvent, in relevant part, as follows:

> (32) The term "insolvent" means—
>     (A) . . . financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>         (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors[.]

11 U.S.C. § 101(32).

The solvency or insolvency of the debtor must be determined as of the date of the transfer. 11 U.S.C. § 547(b)(3). *See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998); *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002).

However, Congress enacted a presumption of the debtor's insolvency within the 90 days preceding the filing of the petition, 11 U.S.C. § 547(c), in response to the "problems engendered by requiring proof of insolvency." *In re Camp Rockhill, Inc.*, 12 B.R. 829, 833 (Bankr. E.D. Pa. 1981). As one court explained:

> Congress has simplified the trustee's burden in preference actions in another way. Section 547(f) grants the trustee a presumption of insolvency during the 90 days before bankruptcy. Under Section 60 of the Bankruptcy Act, proof of insolvency was always difficult. Reconstructing the debtor's books and records was never an

easy matter. Yet it was unusual when a debtor was not insolvent for the 90 days before bankruptcy.

*In re Butler*, 3 B.R. 182, 185 (Bankr. E.D. Tenn. 1980). *See Matter of Emerald Oil Co.*, 695 F.2d 833, 838 (5th Cir. 1983) (citing *Butler*). As a consequence, here, a presumption of insolvency exists as the transfer took place on December 13, 2011, 89 days prior to the petition date of March 12, 2011.

### 2.    Bank's Evidence to Rebut Presumption of Insolvency

The legislative history to section 547 directs that the presumption analysis be "governed by the federal rules of evidence, which state that the presumption merely requires the party against whom it is directed (in this case, the transferee of the preference) to go forward to present some evidence to overcome the presumption. Once he does, the ultimate burden of proof remains with the bankruptcy trustee." H.R. Rep. 95-595, 178-79, 1978 U.S.C.C.A.N. 5963, 6139 (footnote omitted).

Accordingly, here the Bank must rebut the presumption with some evidence that the Debtor was solvent. *Zeta Consumer Prods. Corp. v. Equistar Chem. L.P. (In re Zeta Consumer Products Corp.)*, 291 B.R. 336, 347 (Bankr. D.N.J. 2003). The evidence must be "more than mere allegation" and must be sufficient for the court "to conclude that the debtor was indeed solvent at the time of the transfer." *Id.* (internal quotation omitted); *In re Showtime Enterprises, Inc.*, 05-11089 JHW, 2007 WL 4264516, at *2 (Bankr. D.N.J. Dec. 3, 2007) (evidence must be "non-speculative."). If the Bank provides some evidence of solvency, then the Trustee must prove insolvency by a preponderance of the evidence. *In re Zeta Consumer Products Corp.*, 291 B.R. at 347. On the other hand, if a defendant does not come forward with any evidence to rebut the presumption, the plaintiff has no obligation to introduce any evidence of solvency. *Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Educ. & Research Found.)*, 292 B.R. 68, 77 (Bankr. W.D. Pa. 2003).

The Bank relies solely on a Balance Sheet, ironically introduced at trial and admitted into evidence not by it but by the Trustee, and the testimony of Mr. Guarino, to rebut the presumption of insolvency. The Balance Sheet estimates that as of September 30, 2011 assets exceeded liabilities by approximately $1.5 million.

While a balance sheet test is indeed what section 101(32)'s definition of insolvent calls for, *In re Showtime Enterprises, Inc.*, 05-11089 JHW, 2007 WL 4264516, at *2; 5-547 Collier on Bankruptcy ¶ 547.03 (Matthew Bender 16th ed.) ("A rough 'balance sheet' test determines insolvency[.]"), that is an oversimplification, as balance sheet numbers do not necessarily reflect the fair value of assets. *TWA v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 (Bankr. D. Del. 1994), *aff'd in part, rev'd in part on other grnds,* 203 B.R. 890 (D. Del. 1996), *rev'd,* 134 F.3d 188 (3d Cir. 1998). Rather, it is a starting point from which the parties can then make adjustments based on the testimony of their expert appraisers and accountants. *Id.* As explained in the *Trans World* case:

To label it a "balance sheet" test may be a misnomer. Financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP") do not record assets at fair market value. Instead, they are recorded at the historical, original purchase cost and reduced each year by an estimate of depreciation. Within the contemplation of § 101(32) "property" may include assets not even listed on the balance sheet. Debts are recorded only to the extent they are known and quantifiable; many nonrecorded liabilities usually surface in an insolvency analysis.

*Id.*, at 405, n.22.

But the Bank did not offer any testimony to explain the figures in the Balance Sheet. Instead, after the Trustee introduced it with testimony of its expert, Allen Wilen,[10] the Bank cross-examined Mr. Wilen regarding his criticisms.

On direct, Mr. Wilen had expressed reasons for doubting the veracity of the Balance Sheet. First, rather than being compiled by an accountant, he stated that a balance sheet merely restates the information provided by the company. Tr. 11/15/16, pp. 116-17. This seemed out of the ordinary for the Debtor because all of the other financial statements Mr. Wilen had seen had been accountant reviewed statements. Tr. 11/15/16, p. 116. In addition, the balance sheet was not signed by Mr. Hanlon, the accountant purportedly providing the report. Tr. 11/15/16, p. 117. Mr. Wilen also objected to the "odd period compilation," stating that the only financials of the Debtor that he had seen were year-end statements, not quarterly or semi-annually. Tr. 11/15/16, pp. 117, 119. He pointed out a mathematical error (albeit of only $600). Tr. 11/15/16, pp. 117-18. And finally, the valuation method changed from prior financial statements, moving from a weighted average cost of inventory to the FIFO method. Tr. 11/15/16, p. 118. Mr. Wilen additionally testified that this resulted in the inventory being overvalued, as compared to a fair market value. Tr. 11/15/16, p. 118.

This court agrees that some aspects of the Balance Sheet make its genuineness suspect. Though on cross, Mr. Wilen conceded that an end of September report could represent a quarterly report, Tr. 10/16/15, p. 173, and that the Bank may have requested it, *id.*, p. 174, the Bank did not put on any evidence that it had requested a quarterly report, evidence which certainly would be in its possession. In addition, Mr. Wilen testified that he had found no other quarterly reports for this Debtor. Tr. 10/16/15, p. 174.[11]

The court is less concerned about the amount of the mathematical error, resulting in the total of assets being $600 lower than sum of the itemized assets, and repeated in the liabilities total, than that it also supports some untrustworthiness of the document. Also, the court does not find Mr. Wilen's objections to the valuation method and the lack of GAAP as critical except to the

---

[10] Mr. Wilen, a Certified Public Accountant, Certified Turnaround Professional, and Charter Financial Analyst, was accepted without objection as an expert witness on valuation. Tr. 10/16/15, pp. 97, 102.

[11] Mr. Guarino testified that the Debtor had provided quarterly reports to the Bank for every year that it was in business. *See* Tr-2 10/26/15, p. 40. But, if so, none of these reports were entered into evidence or otherwise testified to.

extent that they highlight that the Bank did not provide any support for the methods used to come up with the Balance Sheet figures.

Mr. Wilen is correct that use of a FIFO method can result in an overestimate of value. *See D.H. Baldwin Co. v. US (Matter of Baldwin United Corp.)*, 48 B.R. 57, 62 (Bankr. S.D. Ohio 1985) ("In a period of rising prices of inventory, use of LIFO [last in-first out] rather than FIFO will increase reported cost of goods sold and reduce reported taxable profits."). *See also Comm. Of Unsecured Creditors of Interstate Cigar Co. v. Interstate Distrib., Inc. (In re Interstate Cigar Co., Inc.)*, 278 B.R. 8, 22 (Bankr. E.D.N.Y. 2002) (noting that had the inventories been costed under the FIFO method rather than by LIFO, they would have been approximately $4,839,000 higher in value). But the Balance Sheet notes also stated that, while using the FIFO method, the company applied the lower of cost or market value ("LCM"). The latter represents the cost of replacement. *Knapp King-Size Corp. v. United States*, 527 F.2d 1392, 1399 (Ct. Cl. 1975) (quoting *D. Loveman & Son Export Corp. v. Commissioner*, 34 T. C. 776, 796 (1960)) (stating LCM does not mean the price at which merchandise is sold or offered for sale).

With the LCM method, if market/replacement values are greater than the inventory's cost, a company would still record the value of the items at the cost. If market values dropped since the purchase, then the company would record the lower market value. Either way, the total either equals or underestimates the replacement value. *See, e.g., Fedders Corp. v. C.I.R.*, 39 T.C.M. (CCH) 1, 1979 Tax Ct. Memo LEXIS 175, *60 (T.C. 1979) (stating that book value determined at lower of cost or market value "is, by definition, equal to or less than [the purchaser's] investment and we think it is not unreasonable to infer that a buyer would be willing to pay this amount for the inventory as part of a going-concern."), *aff'd without opinion, Fedders Corp. v. Commissioner*, 659 F.2d 1066 (3d Cir. 1981); *F. & D. Rentals, Inc. v. C.I.R.*, 365 F.2d 34, 41-42 (7th Cir. 1966) (dissent) (stating that since the inventory was valued at the lower of cost or market value, there was some evidence of the fair market value of the inventory).

As for GAAP-reviewed reports, the case law on proving insolvency in preference actions does not require this, but, like with the balance sheet test, sees it as a starting point. *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (stating that though GAAP is relevant, it is not determinative), *aff'd*, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009); *Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 319 B.R. 447, 456 (Bankr. E.D. Va. 2004) (GAAP value may be correct book value, but not necessarily close to the fair value).

Thus while both objections do not necessarily invalidate the Balance Sheet, they do serve to point out that the court was provided no information from the Bank supporting the Balance Sheet's valuations. This lack of support exists despite the Bank putting its own expert on the stand later in the trial, but not questioning him regarding the Balance Sheet. The court wonders where were Mr. Hanlon, who created the Balance Sheet, or Mr. Schiliro, who allegedly oversaw two inventory valuations during the preference period. The Bank neither presented any direct testimony on the market for this inventory, nor any rebuttal evidence after the Trustee's expert criticized the FIFO method, despite the inventory constituting nearly half of the Debtor's total assets. *See Katz v. Wells (In re Wallace's Bookstores, Inc.)*, 316 B.R. 254, 260 (Bankr. E.D. Ky. 2004) (finding presumption not rebutted by internal unaudited financial statements, that "may not be valued in

accordance with the Bankruptcy Code's definition of 'insolvency,'" against evidence of debtor's downward spiral into insolvency); *Maloney-Crawford, Inc. v. Huntco Steel, Inc. (In re Maloney-Crawford, Inc.)*, 144 B.R. 531, 535 (Bankr. N.D. Okla. 1992) (citing failure of defendant to offer testimony regarding how asset and liability amounts were determined in finding presumption not rebutted). Finally, the Debtor had included with its Amended Schedule B an itemized list of inventory and accounts receivable, the type of list the court doubts did not exist earlier in the Debtor's existence. Thus much evidence appeared available.

Even if the court accepted the Balance Sheet as supporting solvency, the Bank did not put on any evidence supporting that solvency continued from September 30, 2011 until the transfer date of December 13, 2011, a gap of 10 1/2 weeks. *See In re DOLA Int'l Corp.*, 88 B.R. 950, 956 (Bankr. D. Minn. 1988) ("It is insolvency at the date of preferential transfer which is important[.]"). The court notes that the Balance Sheet also showed a net income for the nine months ending September 30, 2011 of only $10,965, and a negative "Net Cash Provided (Used) By Operating Activities" for the nine months ending September 30, 2011 of $1,044,339, thus solvency could have been wavering at this point.

On the petition date, the Debtor's schedules estimated that the Debtor's liabilities exceeded its assets by more than $3.5 million. At some point between September 30, 2011 (10 1/2 weeks before the transfer) and March 12, 2012 (14 weeks after), the Debtor became insolvent. The Bank would have the court merely assume that the Debtor's financial condition did not change until after December 13, 2011. *But see Washington Bancorporation v. Hodges (In re Washington Bancorporation)*, 180 B.R. 330, 334-35 (Bankr. D.D.C. 1995) (finding no evidence to reasonably infer that debtor, "grossly" insolvent on petition date, was also insolvent six months before the petition date, where evidence was also presented that the debtor was solvent one month and two days prior to the transfer).

Though some courts accept a "retrojection" theory, a determination that if a debtor was solvent on two dates then it was solvent on all dates in between, *see In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 276 (Bankr. D. Del. 2005), *aff'd*, 01 01063 KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009), the Bank did not present other evidence of solvency at any time after December 13, 2011, and the only other evidence supports that the Debtor was insolvent on the petition date. *See Washington Bancorporation*, 180 B.R. at 334 ("The courts will only consider retrojection if the evidence of insolvency on the certain date is accompanied by evidence that the debtor['s] financial condition did not change during the pendency period between the time of the payment and the date of proven insolvency."); *In re Kaylor Equip. & Rental, Inc.*, 56 B.R. 58, 62 (Bankr. E.D. Tenn. 1985) (finding that trustee did not sustain burden of proving insolvency where presented evidence that the debtor was insolvent on the petition date but "did not show that there had been no substantial change in the financial condition of the debtor in the period from the transfer to the debtor's bankruptcy filing.").

The Bank also cited Mr. Guarino's testimony in support of a finding of solvency. He had testified that on the date of the transfer:

I knew we had a lot of money. We paid ILC Dover almost $500,000 two days later. We just paid a significant amount of money. We had more money coming in from

California[,] and . . . the State Department [had] already given us indication that they were going to give us an order for $25 million worth of ILC Dover SCape goods. So it looked pretty darn good.

Tr-2. 10/26/15 (Guarino), p. 35.

But while the evidence shows that on December 14, 2011, the day after the alleged preferential transfer, the Debtor wired ILC Dover $487,298 from its operating account, *see* ex. T-12, p. 3, on that same day it also drew $487,300 from the Bank Line and deposited it into the operating account. *See* exs. D-1, p. 9; T-12, p. 2. Thus it appears that it borrowed the money to pay ILC Dover. In addition, Mr. Guarino's optimism about future funds coming in, while possibly supporting solvency if the deals were achieved, does not support solvency on the day of the transfer. The Bank did not even present evidence on whether the hoped-for purchase orders were obtained.[12]

In addition, Mr. Guarino further testified that "As thrilled as I was about the prospects in December, in the middle of January it – everything turned sideways." Tr-2, p. 56. Mr. Guarino testified that at this time, the CDPH was not paying rent to Amerinova, which in turn prevented Amerinova from paying rent to the Debtor. *Id.*, pp. 55-56.

In any case, in arguing that Mr. Guarino claimed the company was doing well, the Bank confuses factors used to support that a debtor was a going concern with those supporting solvency. *See Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996) (suggesting that whether the company was operating, the officers were optimistic, and the managers and lenders continued to invest in the business, were factors to consider whether a debtor was a going concern). That distinction is important in determining whether to value a debtor as a going concern or at a liquidation value. *See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998); *Am. Classic Voyages v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007). It does not prove that it was solvent. For example, though the Debtor was operating on the petition date, its schedules support that it was insolvent then. *See Matter of Dempster*, 59 B.R. 453, 457 (Bankr. M.D. Ga. 1984) (finding presumption not rebutted by evidence of no overdrafts in bank account and that debtor was doing business regularly at the time, because neither spoke to the debtor's assets and liabilities).

Accordingly, the court finds that the Bank did not rebut the presumption of insolvency. It did not present any evidence explaining the Balance Sheet, or showing that its alleged solvency continued to the preference period and the transfer date. As the Bank conceded all of the other elements of a preference, this court finds that the $500K Prepetition Transfer was a preference. *See Matter of Emerald Oil Co.*, 695 F.2d 833, 838-39 (5th Cir. 1983):

---

[12] Mr. Guarino testified about a purchase order with the State Department for ILC Dover products, but stated that "if you keep the State Department happy, there's a potential $25 million order following." *See* Tr-2 10/26/15, p. 48. So it appears that the $25 million purchase order was hoped for, not necessarily obtained.

In the absence of "evidence to meet or rebut the presumption", Fed. R. Evid. 301, the trustee was entitled to rely upon the presumption of insolvency in his favor. . . . To hold that any sort of speculative showing by the party opposed to the presumption would cause it to disappear, no matter how tenuous the claim of possible solvency, would in our view resurrect the mischief . . . that was intended to be cured by the 1978 Code's creation through section 547(f) of the statutory presumption of insolvency.

*Id.* Nevertheless, before judgment can be granted in the Trustee's favor, this court must consider the Bank's defenses to the preference.

### 3.    Bank's Defenses

### a.   Ordinary Course of Business

The Bank argues that the $500K Prepetition Transfer was simply a repayment of a loan that the Guarinos made to the Debtor on September 22, 2011 to provide working capital during a period that the Bank had suspended advances on the Bank Line. Doc. No. 124, p. 17, ¶ 26. As related above, on September 22nd, Mr. Guarino had arranged for a transfer of $500,000 from the Guarino's HELOC account to the Debtor's bank account at the Bank, and then reversed that transaction on December 13, 2011.

Section 547(c) provides that a trustee may not avoid a transfer under section 547:

to the extent that such transfer was in payment of a debt incurred to the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms[.]

11 U.S.C. 547(c)(2).

The Third Circuit has explained that the preference rule "aims to ensure that creditors are treated equitably," while also to encourage creditors to continue to deal with distressed debtors. *Fiber Lite Corp. v. Molded Acoustical Prods. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 219 (3d Cir. 1994). "The preference statute, by allowing the estate to recover in full—for the benefit of all the unsecured creditors—assets which a pushy unsecured creditor unilaterally plucked for itself or which a fawning debtor used in an irregular transaction to advantage a favored creditor, seeks to foreclose these tragedy-of-the-common type responses to a struggling business." *Id.* at 223. "The preference provisions are designed not to disturb normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors." *Id.* at 224.

Although there was only the one transaction, the Bank argues that a first-time transaction can qualify for the preference defense, citing *Jubber v. SMC Elec. Prods. (In re C.W. Min. Co.)*, 798 F.3d 983, 993 (10th Cir. 2015); *In re Ahaza Sys., Inc.*, 482 F.3d 1118, 1125 (9th Cir. 2007); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003); and *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990). Doc. No. 124, p. 18, ¶ 29.

These courts reason that a payment that is not "common" may still be in the ordinary course if it did not favor certain creditors or encourage a race to the courthouse *In re C.W. Min. Co.*, 798 F.3d at 988. The *C.W. Min. Co.* court stated that the debt and the payment must be in the ordinary course of business of both the debtor and the transferee, as opposed to as <u>between</u> the debtor and the transferee, thereby allowing first-time transfers to be in the ordinary course. *Id.*, 988-989. "[A] first-time debt must be ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties." *In re C.W. Min. Co.*, at 990 (quoting *In re Ahaza Sys., Inc.*, 482 F.3d at 1126). This interpretation comports with the purpose of the exception by "leav[ing] undisturbed *normal* financial relations, because [the exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *In re Ahaza Sys., Inc.*, 482 F.3d 1118, 1125 (9th Cir. 2007) (citing *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991)). It also encourages a potential creditor to enter into a transaction with an entity knowing that it could raise the ordinary course of business defense. *C.W. Min. Co.*, at 989.

Here there was no evidence presented by the Bank that the Guarinos were in the business of lending money. According to Mr. Guarino, the HELOC was set up for his wife to purchase property in Florida. Thus the HELOC was not a business account. It was not established for the purpose of providing bridge loans to businesses that the Guarinos were associated with. The court in *Shubert v. Mull (In re Frey Mech. Grp., Inc.)*, 446 B.R. 208 (Bankr. E.D. Pa. 2011), explains the problem aptly.

The Defendants ask this Court to rely on decisions that allow creditors to rely on the ordinary course exemption where the underlying debt was incurred as a part of a first-time transaction with an existing lending institution. The case law relied upon by the Defendants can be distinguished on the ground that the Defendants are not lending institutions. For example, in *Wood v. Stratos Product Development, LLC (In re Ahaza Systems, Inc.)*, 482 F.3d 1118 (9th Cir. 2007), a case cited by the Defendants, the Ninth Circuit acknowledged that as to first-time transactions, "when we have no past debt between the parties with which to compare the challenged one, the instant debt should be compared to the debt agreements into which we would expect the debtor and creditor to enter as part of *their ordinary business operations*." *Id.*, at 1126 (emphasis added). Here, the Defendants admit that they are not engaged in the business of lending. As a result, this Court not only finds that this line of authority to be inapplicable to the parties' situation, it demonstrates that the transactions at issue are necessarily not the type that are intended for § 547(c)(2) protection. . . .

Even if this line of authority was applicable, the Defendants have put forth no evidence as to whether, assuming they are engaged in this type of business, the

terms of the Line of Credit are consistent with prevailing industry practices. To the contrary, this Court finds that Susquehanna Bank's refusal to provide an unsecured line of credit to the Debtor and the Defendants' subsequent acquisition of a line of credit on a secured basis and allowing their daughter, on behalf of the Debtor, to draw directly from the Defendants' line of credit suggest that the transactions at issue do not conform with standard practices. For these reasons, this Court finds that the Defendants have not met their burden.

*In re Frey Mech. Grp., Inc.*, 446 B.R. at 216. In *Frey*, the court found fatal to the defense that the transferee admitted that it was not in the business of making loans to companies such as his son-in-law's, and had not loaned money to other companies. *In re Frey Mech. Grp., Inc.*, 446 B.R. 208, 215 (Bankr. E.D. Pa. 2011) ("This Court finds that this admission necessarily precludes the Defendants from availing themselves of the § 547(c)(2) ordinary course exemption.").

Neither was this transaction carried out according to ordinary business terms, despite the Bank's production of the Promissory Note. *See Wilen v. Pamparo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152, 174-75 (Bankr. D.N.J. 2010) (noting that BAPCPA amended section 547(c)(2) to allow a transferee to prove *either* that the payment of debt was incurred according to ordinary business terms *or* in the ordinary course of business or financial affairs of the debtor and transferee. Before the 2005 amendment *both* standards had to be met.").

The note appears drafted internally, possibly in haste and without attorney review, as many inconsistencies abound. First, it is not clear whether the note is due when the "payable" is received, on December 15, 2011, or "[o]nce a sizeable payment from the service agreement with California is received." Business people would have drafted this with "whichever comes first" (or last) language. The payable from California is not defined, but rather described as "a sizeable payment." Sentences such as "This money is to be viewed as an extended line of credit from Susquehanna and the Guarinos, [sic] require, [sic] that, [sic] because it is a credit extension over and above what Susquehanna is willing to extend, it should be treated a [sic] priority" are rife with typos.

The court also wonders about the security pledged by the Debtor of "its rights to any and all assets, inventory, patents and possessions. All receivables from California state, county or municipal government agencies are included," considering the Bank's pre-existing security interest on the same assets. There was no evidence that a UCC-1 financing statement was filed, something that business people would be sure to do.

Finally, the Debtor did not even fully comply with the note, as it repaid $500,000 rather than $500,000 with interest of 10%, and paid it to the Guarinos' HELOC account rather than "to the order of Stephen and Kathleen Guarino[.]"

That Mr. Guarino is the sole shareholder and a business person does not transform the transaction into an ordinary business transaction. As shareholder he had invested in the company, but this transaction was entered into by both him and his wife, and was a loan, not a capital contribution. *See In re Epic Cycle Interactive, Inc.*, ADV 11-90111-CL, 2014 WL 2567170, at *14 (Bankr. S.D. Cal. June 6, 2014) (stating that the defense is meant to protect trade creditors in the ordinary course of the debtor's and creditor's business affairs, not stockholders for short-term

loans to maintain operations during capitalization problems); *In re Pioneer Tech., Inc.*, 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988):

> In our view, the instant transaction does not fall within the purview of § 547(c)(2). By Appellant's own admission, the April advances by him and his wife to the Debtor were intended to be short term loans to cover "cash flow shortfalls" of the company. Appellant was not a trade creditor of the Debtor. Nor can it be said that this transaction was in the ordinary course of the Debtor's or Appellant's business affairs. We do not believe that a short term loan made by a debtor's shareholder in order to allow the debtor to maintain operations despite capitalization problems falls within the ordinary course of business exception to § 547.

*See also Lee's Place v. Hawbaker*, 92-4006, 1992 WL 164443, at *7 (C.D. Ill. June 26, 1992) (rejecting defense where short term emergency loans made and repaid by general manager without any documentation). The Note even makes clear that it is not intended as a capital contribution. The transaction was not made at arm's length considering Mr. Guarino's insider status, and Thomas Guarino, one of the signators of the note, did not recall who prepared it, any negotiations, or even signing it. Tr. 10/15/15, pp. 206-207. There was no evidence proffered that the terms of the note were ordinary.

Accordingly, this court rejects the Bank's defense of the preference on the basis of ordinary course of business.

### b. The Trustee Must First Avoid the Payment as to the Guarinos

The Bank next argues that the Trustee had to first bring a successful preference action against the Guarinos before seeking recovery from the Bank. Doc. No. 124, p. 18, ¶ 31. The Trustee responds that, as the Bank is the initial transferee, this was not necessary. Doc. No. 125, p. 57, n. 28.[13] The court will first address the Bank's argument.

Bankruptcy Code Section 550(a) permits a plaintiff to recover a preferential transfer from "(1) the initial transferee of such transfer or the entity to whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." The Bank contends that before the Trustee can recover, he must separately prove against the initial transferee that an avoidable preference exists. Since the Trustee did not, in this action, sue the Guarinos, the Bank argues that the Trustee cannot recover against the Bank.

---

[13] The Trustee also noted that the Bank had sought to intervene in adversary proceeding 12-1879-ABA because the Trustee there brought a preference action against the Guarinos. Adv. Proc. No. 12-1879, Doc. No. 19. The Trustee states that the motion was overruled, but the docket entry for September 17, 2014 indicates that the motion was withdrawn. Ultimately, an order entered on a motion to dismiss filed by, *inter alia*, the Guarinos, directed that the Trustee's preference count lodged against the Guarinos in that proceeding would be dismissed with prejudice if the Trustee were successful in avoiding and recovering the same $500,000 claim from the Bank in this proceeding. *See* Adv. Proc. No. 12-1879, Doc. No. 25.

In support, the Bank cited a number of cases. In *In re Slack-Horner Foundries Co.*, 971 F.2d 577 (10th Cir. 1992), the court held that where trustee attempted to avoid a transfer and recover property from a tax lien foreclosure purchaser, it instead had to first avoid transfer of the property to the state. *Id.*, at 580. "The trustee may not bypass the interest of the state in the property by characterizing the transaction as a transfer of the debtor's interest to Simons." *Id.*, at 581. *But see Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 398 (E.D. Pa. 2013) (citing *Slack-Horner*, and stating "We find persuasive those cases that have held that § 550 does not render recovery from a subsequent transferee dependent on a prior action or recovery against the initial transferee.").

The Bank also cited *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75 (Bankr. S.D.N.Y. 2006), *rev'd and remanded sub nom. In re Enron Creditors Recovery Corp.*, 388 B.R. 489 (S.D.N.Y. 2008), but while that case required avoidance of the initial transfer prior to recovery, it did allow the two actions to be brought simultaneously. *Id.*, at 82.[14] *See also In re Furs by Albert & Marc Kaufman, Inc.*, 03-41301 SMB, 2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 14, 2006) (following *Enron Corp. v. Int'l Fin. Corp.*, 343 B.R. 75). The *Enron* court required actual avoidance, rather than avoidability, stating that else the statute of limitations under section 546(a) would be "rendered nugatory." *Enron Corp. v. Int'l Fin. Corp.*, 343 B.R. at 82.

Section 546(a) sets a limitation of the later of two years after the entry of the order for relief or one year after the appointment of the first trustee, or the time the case is closed, to bring an avoidance action. 11 U.S.C. § 546(a). Section 550 provides that recovery of a transfer is limited to the earlier of one year after the avoidance of the transfer or the time the case is closed. 11 U.S.C. § 550(f). Courts holding that two actions must be commenced—one for avoidance, then one for recovery—cite these statutes of limitations as support that Congress intended two actions. *See Williams v. Mortillaro (In re Res., Recycling & Remediation, Inc.)*, 314 B.R. 62, 69 (Bankr. W.D. Pa. 2004). *See Atkins v. Gelt Props., LLC (In re Atkins)*, 525 B.R. 594, 604 (Bankr. E.D. Pa. 2015) (following *Williams v. Mortillaro*). That is, section 550(a) requires recovery of fraudulent transfer only after a transfer is avoided, else the separate statutes of limitations in sections 546 and 550 would be meaningless. *Greenwald v. Latham & Watkins (In re Trans-End Tech., Inc.)*, 230 B.R. 101, 104 (Bankr. N.D. Ohio 1998).

But the majority of courts hold that "a transfer may be found avoidable and a recovery may be had from a subsequent transferee without suing the initial transferee." Collier on Bankruptcy, ¶ 550.02[1] (Matthew Bender 16th ed.) (citing *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 501 B.R. 26, 34 (S.D.N.Y. 2013); *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 734 (B.A.P. 9th Cir. 2008); *IBT Int'l Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 706 (11th Cir. 2005); *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 745 (Bankr. S.D.N.Y 2008); *Leonard v. Optimal Payments Ltd. (In re National Audit Def. Network)*, 332 B.R. 896, 915 (Bankr. D. Nev. 2005); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*,

---

[14] It is unclear whether the reversal of the judgment affected this holding. The District Court stated, in part, that the judgment was remanded for the appellants to amend the complaint to show "why, given the circumstances of those transactions, appellants have no practical ability to effect a recovery under 11 U.S.C. § 550(a)(2), unless a declaration of avoidance against the initial transferee can be made simultaneously, or prior to, with a declaration authorizing a recovery against a subsequent transferee." *In re Enron Creditors Recovery Corp.*, 388 B.R. at 490.

195 B.R. 455 (N.D. Cal. 1996)). *See also Bash v. Textron Fin. Corp.*, 524 B.R. 745, 755 (N.D. Ohio 2015) (rejecting *Greenwald* as widely criticized, and noting that the majority of courts have held otherwise). "In an action against the subsequent transferee, the estate has the burden of proving that the transfer to the initial transferee is avoidable and the subsequent transferee is not collaterally estopped from litigating that question merely because it is a subsequent transferee." Collier on Bankruptcy, ¶ 550.02[1].

The Third Circuit has not weighed in on the issue, but this court finds persuasive the analysis of the majority view. For example, the Eleventh Circuit reasoned that "[n]othing in the language of Section 550 requires a plaintiff in a fraudulent transfer adversary proceeding to avoid the transfer received by the initial transferee before continuing with avoidance actions down the line of transfers." *IBT Int'l, Inc. v. Northern*, 408 F.3d at 706 (quoting lower court's decision agreeing with *In re Richmond Produce Co., Inc.*, 195 B.R. 455 (N.D. Cal. 1996)). "Avoidability 'is an attribute of the transfer rather than that of the creditor,'" thus the original transferee did not have to be sued prior to pursuing a mediate transferee. *In re Richmond Produce*, 195 B.R. at 463 (internal quotation omitted). The Eleventh Circuit believed that "Congress contemplated 'to the extent that a transfer is avoided' to be a simultaneous as well as successive process." *IBT Int'l, Inc. v. Northern*, 408 F.3d at 708. Accordingly, it held that the trustee there did not have to first sue the initial transferee to successfully avoid a transfer of assets to immediate and mediate transferees. *Id.*

Accordingly, the court rejects the Bank's defense on this basis.

### c.   The Bank Took for Value and in Good Faith

Once a transfer is found avoidable, a plaintiff may recover the property transferred pursuant to section 550, which provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

A plaintiff's ability to recover is limited by section 550(b), however.

> (b) The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> > (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b). In other words, while section 550(a) provides for the recovery of a transfer, section 550(b) creates a "safe harbor" for immediate and mediate transferees who took for value, in good faith, and without knowledge of the voidability of the transfer avoided, or who were transferees of such an immediate or mediate transferee. *Burtch v. Hydraquip (In re Mushroom Transp. Co., Inc.)*, 227 B.R. 244, 259 (Bankr. E.D. Pa. 1998). Thus, it is important to determine whether the entity from which a plaintiff seeks to recover is an initial transferee or an entity for whose benefit such transfer was made, versus an immediate or mediate transferee, as only the latter may assert the section 550(b) defense. *In re Walldesign, Inc.*, 8:12-BK-10105-CB, 2015 WL 4399843, at *3 (C.D. Cal. July 17, 2015).

The Bank argues that Mr. Guarino, not it, was the initial transferee. Doc. No. 124, p. 20. Rather, it was an immediate transferee that took in good faith, as Mr. Guarino controlled the entire transaction without advising or consulting the Bank before or after the transfer. *Id.* The Trustee counters that because the funds were seamlessly transferred from the Debtor's account to the Guarinos' HELOC account at the same bank, the Bank is the initial transferee. Doc. No. 125, pp. 57-60. Alternatively, the Trustee argues that because the Bank paid down the Guarinos' loan from it, the Bank was a party for whose benefit the transfer was made. Doc. No. 125, p. 60, n. 31. Given these arguments of the Trustee, he does not address whether the safe harbor provision of section 550(b), i.e., whether the Bank took in good faith and without knowledge of the avoidability of the transfer, applies. *See id.*, p. 57, n. 28.

The leading case on determining whether an entity is a transferee is *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988). There, European American Bank ("EAB") received a check from Bonded Financial Services, a currency exchange controlled by Michael Ryan, to be deposited to Ryan's account. *Bonded Fin. Servs.*, 838 F.2d at 891. Ten days later, Ryan instructed EAB to transfer that same amount of money to the account at EAB of Shamrock Hill Farm, a horse farm Ryan owned, to pay down a loan of this business from EAB. *Id. Bonded*'s trustee argued that EAB was either an initial transferee or an entity for whose benefit the transfer was made, or, if a subsequent transferee, it did not take for value or in bad faith. *Id.* EAB argued, and the District Court agreed, that it was a "mere conduit" of Bonded's transfer to it, and a subsequent transferee of Ryan's transfer to it, which it took for value and in good faith. *Id.*, at 891-92.

*Bonded* first tackled what a transferee is, and decided that the "minimum requirement" was that the entity had "dominion over the money or other asset, the right to put the money to one's own purposes." *Id.*, at 893. It distinguished this from an entity that is merely a "'possessor' or 'holder' or 'agent'." *Id.*, at 894. The transfer from Bonded to EAB fit this second definition, as EAB could not use the money in Ryan's account for its own purposes. *Id.*, at 893-894.

As for "an entity for whose benefit the transfer was made," the court decided when Ryan transferred the funds from his checking account to the loan account, that EAB could not be this beneficiary, because it was a subsequent transferee of the initial transfer. *See id.*, at 895. Section 550(a)(1) separates initial transferees and entities for whose benefit the transfer was made from section 550(a)(2)'s immediate and mediate transferees. *Id.* Accordingly, an entity must fall under one subsection or the other: a subsequent transferee cannot also be an entity for whose benefit the

transfer was made. *Id.*, at 895-896. *See In re Glob. Outreach, S.A.*, CIV.A. 11-620 JLL, 2011 WL 2294168, at *11 (D.N.J. June 6, 2011) (unpublished) (holding that the categories in subsections (a)(1) and (a)(2) are "mutually exclusive.").

In determining that EAB was a subsequent transferee, the *Bonded* court distinguished "one-step" from "two-step" transactions. *Id.*, at 893-94. In *Bonded*, the funds were transferred twice: once from Bonded to EAB, then from Ryan's bank account to EAB's loan account. In the first transfer, Bonded was only a holder of the funds, because it could not put the money to its own uses. But the second transfer paid Ryan's debt to it, so Bonded then became a transferee, then having a right to put the money to its own purposes. But it was a subsequent transferee, because it was not the recipient of the first transfer. The court explained:

> If the note accompanying Bonded's check had said: "use this check to reduce Ryan's loan" instead of "deposit this check into [Ryan]'s account", § 550(a)(1) would provide a ready answer. The Bank would be the "initial transferee" and Ryan would be the "entity for whose benefit [the] transfer was made." The trustee could recover the $200,000 from the Bank, Ryan, or both, subject to the rule of § 550(c) that there may be but one recovery.

*Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988).[15]

Because in *Bonded* the funds first went to Ryan's account at EAB, Ryan was the first to have the dominion over the funds, the right to use the money for his own purposes. *Bonded*, 892. In the interim, Ryan could have done anything with the money, or, as famously stated by the court, was "free to invest the whole $200,000 in lottery tickets or uranium stocks." *Id.*, at 894. Thus Ryan was the initial transferee and, when the funds were transferred again, EAB became a subsequent transferee.

While the Third Circuit has not written on this issue, *Bonded* has been followed by several New Jersey courts. *See In re Rocco Co., Inc.*, 10-18799 DHS, 2014 WL 7404566, at *9 (D.N.J. Dec. 29, 2014) (unpublished); *In re Allen*, 13-14348 (GMB), 2014 WL 1246292, at *6 (Bankr. D.N.J. Mar. 26, 2014) (unpublished); *Bond v. Vining Sparks (In re U.S. Mortgage Corp.)*, 492 B.R. 784, 813-14 (Bankr. D.N.J. 2013); *In re Parcel Consultants, Inc.*, 287 B.R. 41, 46 (Bankr. D.N.J. 2002). In addition, a majority of circuits have followed *Bonded. See Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 533 (6th Cir. 2003) ("The test *Bonded* created has come to be known as the dominion-and-control test, and has been '"widely adopted."'"); *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1102 (9th Cir. 2002); *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2nd Cir. 1997); *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 156 (4th Cir. 1996); *Luker v. Reeves (In re Reeves)*, 65 F.3d 670, 676 (8th Cir. 1995); *Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 44

---

[15] The *Bonded* court reasons that initial recipients of fraudulent transfers are in the best position to monitor the risk that the transfer is fraudulent. *Bonded*, at 892-93. But since section 550(a) provides for the recovery of other types of transfers that are not fraudulent, such as a preference (which is only determined in hindsight, after the transferor files for bankruptcy), this reasoning is limited.

(10th Cir. 1994) ("We find the reasoning of the *Bonded* court to be persuasive in deciding the case before us."); *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir. 1993).

Applying *Bonded*'s "dominion" test to the facts here, the court finds that this is a one-step transaction. Mr. Guarino never possessed the funds, as they were transferred directly from the Debtor's bank account to the Guarinos' at the same bank. This makes the Bank the initial transferee.

In a case similarly involving a principal directing corporate funds to pay an individual debt, there to the Hilton casino, the court held that Hilton was the initial transferee.

> [T]he Hilton clearly received the debtor's funds and acquired the immediate right to put the money to its own use. Arlynn may have had the right, as debtor's principal, to [] direct the use of its funds. However, he never actually received the funds. Under the test, he is not the initial transferee, but rather the entity for whose benefit the transfer was made.

*Schafer v. Law Vegas Hilton (In re Video Depot, Ltd.)*, 186 B.R. 126, 133 (Bankr. W.D. Wash. 1995), *aff'd*, 127 F.3d 1195 (9th Cir. 1997). In *Video Depot*, because the cashier's check was construed as a direct transfer, the principal who directed the transfer did not have the right to use the money for any other purpose than to give it to Hilton. *Video Depot*, at 1198. *See Richardson v. FDIC (In re M. Blackburn Mitchell Inc.)*, 164 B.R. 117, 125 (Bankr. N.D. Cal. 1994) (rejecting the argument that the principal was the initial transferee because she exercised dominion over the funds by directing the corporation to pay her personal debt).

The decision in *Ray v. City Bank and Trust Co. (In re C–L Cartage Co., Inc.)*, 899 F.2d 1490 (6th Cir. 1990), also involving a corporation paying an insider's debt, though not citing *Bonded* or any other "transferee" tests, nevertheless supports this "one-step" analysis. There, when a bank would not loan money to a corporation, the president of the corporation borrowed the money but transferred the proceeds to the corporation. *Id.*, at 1491. The corporation then made the monthly payments directly to the bank on the president's behalf. *Id.*[16]

The Sixth Circuit held that the corporation paid its debt to the corporation's president by paying the president's debt to the bank. *C–L Cartage Co., Inc.*, 899 F.2d at 1493. Because the payments went directly from the corporation to the bank, the bank was the initial transferee. *Id.*, at 1495.

Similarly here, the Debtor paid the $500,000 it owed the Guarinos by paying the Bank directly on the Guarinos' debt to the Bank. The money never passed through Mr. Guarino's hands. *See Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996):

---

[16] The Sixth Circuit did not suggest that there was anything illegitimate about this arrangement. The bankruptcy court, had, in fact, suggested that the bank, having turned down the corporation for a loan, knew that the loan it granted to the president was really a loan to the corporation. *In re C-L Cartage Co., Inc.*, 70 B.R. 928, 933 (Bankr. E.D. Tenn. 1987).

Determining the *initial transferee* of a transaction is necessarily a temporal inquiry; there must be a transfer before there can be a transferee. The extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550.

One of our sister bankruptcy courts in the Third Circuit breaks ranks with this conclusion, holding instead that the person directing the corporation to make the transfer is the initial transferee. *See Lieberson v. IRS (In re C.F. Foods, L.P.)*, 265 B.R. 71 (Bankr. E.D. Pa. 2001). Citing *Genova v. Gottlieb (In re Orange County Sanitation, Inc.)*, 221 B.R. 323, 328 (Bankr. S.D.N.Y. 1997), the *C.F. Foods* court stated that "the requisite dominion or control [to be deemed the initial transferee] is present when a corporate officer or shareholder causes the corporation to make payments on his personal debts or for his personal benefit." *C.F. Foods*, at 81.

The *Orange County Sanitation, Inc.* court had cited *In re Nordic Vill., Inc.*, 915 F.2d 1049, 1055 (6th Cir. 1990). The *Nordic Village* court distinguished between a transferor who acted for the debtor and one acting for himself. There, Josef Lah, an officer and shareholder of a debtor corporation, drew a corporate check to a bank that in turn issued several cashier's checks. Lah took one of those checks to the IRS with instructions to credit it against his personal tax liability. The court explained that the identity of the initial transferee depended upon Lah's authority to take this action.

> In this case, the IRS was either the "initial transferee" or an "immediate . . . transferee of such initial transferee." If Lah is viewed as acting for Nordic, then the IRS is the "initial transferee." If Lah is viewed as having taken money illegally from Nordic, he is the "initial transferee" and the delivery of the cashier's check to the IRS makes the IRS an "immediate transferee" of Lah, the "initial transferee."

*In re Nordic Vill., Inc.*, at 1055. Notably, the *Nordic Village* court relied on two cases that pre-date *Bonded*: *Ross v. United States (In re Auto-Pak, Inc.)*, 73 B.R. 52, 54 (D.D.C. 1987), and *Still v. American Nat'l Bank & Trust Co. (In re Jorges Carpet Mills, Inc.)*, 50 B.R. 84 (Bankr. E.D. Tenn. 1985). *Bonded* is only cited in a dissent. *In re Nordic Vill., Inc.*, at 1062.

Confronting the issue again later the same year, the Eastern District of Pennsylvania Bankruptcy Court relied on District of Delaware and Western District of Pennsylvania cases.

> The key characteristic of a conduit is that the person or entity is under a contractual or other obligation to use the transferred funds or assets for the benefit of a third party and may not put those funds or assets to its own use. *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 104 (Bankr. D. Del. 2006) (collecting cases). By comparison, if an entity has the "power to redirect the funds to its own use" and may exercise dominion over the funds, the defendant is not a mere conduit. *In re Le Nature's, Inc.*, 2009 U.S. Dist. LEXIS 85073, 62 (W.D. Pa. Sept. 16, 2009) (quoting *Lenox Healthcare*, 343 B.R. at 103).

*Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 450-51 (Bankr. E.D. Pa. 2014).

While it is tempting to follow these cases, as they result in the "bad guy" being the initial transferee, the test under *Bonded* focuses on entities that actually receive funds, and then consider whether they can or cannot put the money to one's purposes. *C.F. Foods* and *Polichuk* overlooks that section 550(a) makes a transferee liable for recovery, not a transferor, i.e., the mere conduit. "[I]n order to be a 'transferee' of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else." *Bond v. Vining Sparks*, 492 B.R. at 813 (quoting *Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46 (Bankr. D.N.J. 2002)).

Furthermore, including in strict liability the entity for whose benefit the transfer was made allows for recovery from the "bad guy" in this scenario. As explained in *General Elec. Capital Auto Lease v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 809-10 (B.A.P. 9th Cir. 1995):

> Moreover, if the distinction between an initial and a subsequent transferee turns on whether the party benefitting from the transfer "forced" the debtor to make the transfer, then the scope of liability under section 550 is unduly narrowed. Section 550(a)(1) subjects to strict liability not only the initial transferee, but also "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). The party who forces a debtor to make a transfer is almost always "the entity for whose benefit such transfer was made," and thus is generally always subject to strict liability. Yet Congress intended to make initial transferees also strictly liable for the transfer (subject to the restriction that the trustee is entitled to only one recovery under section 550(c), presently codified at 11 U.S.C. § 550(d)). "The implication is that the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise." *[In re] Bullion Reserve [of North America]*, 922 F.2d at 548. Consideration of whether the beneficiary of the transfer "forced" the debtor to make the transfer would collapse the two prongs of strict liability into a single party. It would permit entities who are "initial transferees" in the plain sense of the term to escape liability, and deprive the bankruptcy estate (and thus the debtor's creditors) of an additional source for recovery. There is nothing in the statute or otherwise to justify this result.

As for whether the "good guy," the initial transferee of a principal's transfer of corporate funds for his or own personal benefit, should also be liable, that is what Congress decided should happen.

The Court concludes that it is irrelevant as a matter of law that the FDIC did not have knowledge, or reason to believe, that the funds it received flowed from Debtor's account. Under § 550 of the Bankruptcy Code, it is crystal clear that even the "innocent" initial transferee is liable for the fraudulently transferred funds. *See* 4 Collier on Bankruptcy ¶ 550.03 at 550–15 (15th ed. 1993). While policy arguments can be raised on both sides of the issue as to whether an innocent initial transferee *should* be liable for fraudulently transferred funds, the statute is unambiguous on this point.

*In re M. Blackburn Mitchell Inc.*, 164 B.R. 117, 125 (Bankr. N.D. Cal. 1994). Possibly, Congress decided that recovery from the embezzling principal would be difficult, thus it also made the first recipient of those funds liable to returning them.

> There is almost always some injustice or hardship which attends transactions occurring after the filing of a petition in bankruptcy . . . because the loss must fall either upon the third person or upon the creditors of the bankrupt. Whether the line which has been drawn is the best possible solution of the problem is not for the courts to say.

*In re Se. Hotel Properties Ltd. P'ship*, 99 F.3d 151, 157-58 (4th Cir. 1996) (quoting *Lake v. New York Life Ins. Co.*, 218 F.2d 394, 399 (4th Cir. 1955)).

*Bonded's* step approach gives purpose to section 550(a)'s language by focusing on the receipt of funds. Who directs the transfers is not relevant—it is who receives the funds and what they can do with them that determines who is a transferee as opposed to a mere conduit. The solution when a person misdirects corporate funds, may be a breach of duty action against them. *Rupp*, at 941.

Because Mr. Guarino never received the money, he cannot be the initial transferee, and the Bank is. Accordingly, this court need not determine whether the Bank took the transfer for value, in good faith, and without knowledge of its avoidability. The Trustee may recover the $500,000 Prepetition Transfer from the Bank.[17]

As a result of this finding, the court need not consider the Trustee's Second Count, seeking to avoid the $500,000 Prepetition Transfer as fraudulent under section 548(a)(1)(A).[18]

## C.   Fourth Count – Violation of the Cash Collateral Order

In the Fourth Count the Trustee seeks to avoid the postpetition transfers that he alleges were made without court authority to the Bank on its prepetition claim. The transfers can be divided into two categories by date.

---

[17] While this result suggests that the Guarinos are the entities for whose benefit the transfer was made, *see Rupp v. Markgraf*, 95 F.3d at 941 ("Furthermore, the fact that the money was being used by the Markgrafs to pay Davis' debt, without more, simply makes Davis the 'entity for whose benefit [the] transfer was made.'"); *In re M. Blackburn Mitchell Inc.*, 164 B.R. 117, 130 (Bankr. N.D. Cal. 1994) ("There is no question that Ms. Mitchell caused Debtor to transfer its funds in order to pay Ms. Mitchell's debt to the FDIC. As a result, she is "the entity for whose benefit such transfer was made [and] . . . is liable for the transfer on that basis under § 550(a)(1)."), the court refrains from making this finding, as by order entered September 15, 2014, the Trustee's preference count against the Guarinos in Adv. Proc. 14-1299-ABA is to be dismissed with prejudice if he is successful in avoiding and recovering the same $500,000 from the Bank in this proceeding. Adv. Proc. No. 14-1299-ABA, Doc. No. 25.

[18] Due to this holding, the court need not consider the Second Count, Fraudulent Transfer. The Trustee voluntarily dismissed the Third Count.

<u>May 1, 2012</u>
$200,000 by the Debtor
$100,000 by Amerinova
$205,000 by Discount Central

<u>June 11, 2012</u>
$100,000 by the Debtor
$50,000 by Amerinova

The Trustee seeks to avoid the transfers pursuant to section 549(a) of the Bankruptcy Code, which provides:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
>
>> (1) that occurs after the commencement of the case; and
>>
>> (2)    (A) that is authorized only under section 303(f) or 542(c) of this title;
>
> or
>
>> (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). Once a plaintiff proves that a postpetition transfer was not authorized, Federal Rule of Bankruptcy Procedure 6001 places the burden of proving the validity of the transfer on the entity asserting that validity.

As discussed above, the Debtor's use of the Bank's cash collateral was limited by a Cash Collateral Order [19] covering the period of April 9, 2012 through June 30, 2012. Through this order, the Debtor was permitted to use cash collateral only for items on an attached budget (not to exceed 10%), and for certain payments deemed the Carve-Out Payments. Regarding the Bank, the budget included only interest payments to the Bank. The Carve Out Payments included a payment to it not to exceed $188,000 to be paid after the Debtor received payment in full of the proceeds of its sale of the good identified in the ILC Purchase Order, and to the extent that the Debtor maintained at least $275,000 in available cash after receiving the ILC payment and making or accruing for undisputed items approved for payment in the budget.

In return, the Bank received a lien on all of the Debtor's postpetition assets and proceeds thereof, the same as its lien on the Debtor's prepetition assets. To the extent that the lien was insufficient, the Bank would also receive a superpriority administrative expense claim, subject only to the Carve-Out Payments. The Debtor was to provide the Bank with bi-weekly accountings, and the Bank was granted a right of inspection and audit.

The court agrees that the Cash Collateral Order limited the Debtor to using cash collateral for specified purposes only, with "no expenses . . . paid or incurred by Debtor except for the expenditures set forth in the Budget and Carve Out Payments[.]" Ex. T-13, pp. 5-6. The Bank in fact stipulated that it had acknowledged that the June 11th $100,000 Debtor Transfer went beyond what was contemplated in the Cash Collateral Order because the Bank understood only "a"

---

[19] As noted in Part A., above, the court reviews the Cash Collateral Order by "applying normal contract interpretation provisions." *In re Residential Capital, LLC*, 501 B.R. 549, 621 (Bankr. S.D.N.Y. 2013).

payment would be allowed. JS, ¶ 149. Therefore the Bank is wrong that the Debtor was free to make other payments to the Bank. The Bank was only entitled to receive the interest payments provided for in the budget, and the Carve Out Payment of not more than $188,000, provided the Debtor then had at least $275,000 in available cash after receiving the ILC payment, paying or accruing for undisputed items in the budget, and making the payment to the Bank. The latter could not be paid until after the Debtor had received payment in full of the proceeds of its sale of the goods identified in the ILC Purchase Order, which did not occur until May 25th. Thus no payments made prior to that date were authorized, and payments made after that date were acceptable only if the Debtor had at least $275,000 in cash.

The parties agreed that the Debtor received the final portion of payment for the goods identified in the ILC Purchase Order on or about May 25, 2012, and that the Debtor did not have $275,000 available on June 11, 2012.

The court will now review the various postpetition transfers for avoidability.

### 1.    The Debtor's Transfers

It is undisputed that the Debtor transferred $200,000 on May 1st and $100,000 on June 11th to the Bank. These were postpetition transfers, and as the Cash Collateral Order only allowed the Debtor to pay the Bank interest payments and one payment after the ILC Dover payment, these transfers were not authorized by court order. The court will address, below, the Bank's late argument that the transfers were authorized under title 11.

### 2.    The Amerinova Transfers

Again, there is no dispute that Amerinova made two transfers to the Bank postpetition. The Trustee argues that, although Amerinova was a co-borrower on the Line of Credit, the payments at issue were clearly made on the Debtor's behalf, as the checks included the handwritten notes of "for Global Protection" and "line paydown." Doc. No. 125, pp. 51-52, ¶ 66. Neither payment was authorized by the court. Id., ¶ 67. Both should be considered part of the Debtor's cash collateral and thus governed by the terms of that order, which did not authorize these payments. Id. The only payments other than the one described in paragraph six of the Cash Collateral order that the Bank was entitled to postpetition were the interest payments included in the budget. Id., ¶ 50. In addition, the May 1st payment was not authorized because it occurred prior to the May 25th payment from ILC Dover. Id., ¶ 51.

The Trustee further argues that regardless of Amerinova not being the Debtor, the funds transferred were property of the estate. Id., ¶ 68. The money paid by Amerinova was owed to the Debtor as an account receivable of rent. Id., 70. Amerinova was obligated to pay the Debtor $56,850 per month in rent in 2012, an item included in the budget attached to the Cash Collateral order. Id., ¶¶ 71-72. Amerinova did not make any rent payments to the Debtor after its March 27, 2012 payment. Id., ¶ 73. Because the Bank received property of the estate without a specific court order authorizing the transactions, the Amerinova transfers must be avoided under section 549. Id., ¶ 76.

The Bank counters that Amerinova made the payments to the Bank because Mr. Guarino had instructed it to pay over the rent payments directly to the Bank in the event of Global's insolvency or inability to pay its California lease obligations. Doc. No. 124, p. 11, ¶ 81. It also made the two payment to the Bank because it was obligated on the line of credit. *Id.*, ¶ 85. "In addition, any monies owed by Amerinova would be accounts receivable covered by the Bank's security interest." *Id.*, ¶ 86.

The Bank argues that, since these payments were made by a third party, not Global, the transfers cannot be avoided. Doc. No. 124, pp. 24-25, ¶¶ 84-88. The transferred assets were not property of the estate of the Debtor. *Id.*, ¶ 88. In addition, the Bank had a security interest in all of the assets of the Debtor and Amerinova, including all accounts receivable, and Amerinova was independently liable to the Bank on the Line of Credit. *Id.*, ¶¶ 89, 91. "That Amerinova may have also been indebted to Global at the time Amerinova made payments to the Bank does not make those payments avoidable." *Id.*, ¶ 92.

The court agrees with the Trustee that the transfers represented funds owed to the Debtor. First and foremost, Mr. Guarino testified "that any payments that are owed on the rent should go directly to Susquehanna Bank." Tr-2, p. 56. The budget included income to the Debtor from payment of this rent. The $100,000 check to the Bank from Amerinova bore the instruction "for Global Protection" supporting that Amerinova was not paying down the Line of Credit for its own account. While Amerinova was a named borrower on the line of credit, the parties stipulated that it otherwise did not owe the Bank any money, and there was no evidence of it ever drawing down on the line, and why would it when its only function was to facilitate the warehouse contract. Thus the court concludes that the payment was the rent account receivable owed to the Debtor that Mr. Guarino improperly directed to be paid to the line of credit. The Bank presented no contrary evidence. Accounts receivable are property of the estate. *Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 452 (Bankr. S.D. Ga. 2000) (holding that postpetition "payments on accounts receivable . . . are unquestionably property of the estate since they constitute proceeds of an estate asset—accounts receivable[,]" citing U.S.C. Section 541(a)(6)); *Ackerman v. Schultz (In re Schultz)*, 250 B.R. 22, 31 (Bankr. E.D.N.Y. 2000) ("well settled" that accounts receivable of a debtor are property of the estate); *In re AIC Indus., Inc.*, 83 B.R. 774, 777 (Bankr. D. Colo. 1988). Thus this court concludes that Amerinova's transfers to the Bank constituted rent payments owed to the Debtor.

The Bank cites two cases in support of a third party's payment to a debtor's creditor not being recoverable by a trustee, *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir. 1986), and *In re Hartley*, 825 F.2d 1067 (6th Cir. 1987). But both cases instead concerned the doctrine of earmarking. The latter is described as where a third party loans the debtor funds to enable the debtor to pay the claim of another creditor. *Coral Petroleum*, 797 F.2d at 1356. If the lender pays the creditor's claim directly, the debtor still owes the same amount, except to the lender instead of the creditor. The loan "proceeds never become part of the debtor's assets, and therefore no preference is created." *Id.* (quoting 4 *Collier on Bankruptcy* ¶ 547.25 at 547 (15th ed. 1986)); *see In re Hartley*, 825 F.2d at 1070 ("When a third person loans money to a debtor specifically to enable him to satisfy the claim of a designated creditor, the general rule is that the proceeds are not the property of the debtor, and therefore the transfer of the proceeds to the creditor is not

preferential."). The key is whether "'the debtor ha[d] an interest in the property transferred so that the estate is thereby diminished.'" *Coral Petroleum*, 797 F.2d at 1355-56 (quoting *Genova v. Rivera Funeral Home (In re Castillo)*, 39 Bankr. 45, 46 (Bankr. D. Colo. 1984)).

But here, the Debtor did not borrow money from Amerinova to pay the Bank. Moreover, it had an interest in the funds Amerinova paid to the Bank instead of to the Debtor, as it was an account receivable. Amerinova's payment to the Bank did not give rise to an obligation of the Debtor to repay Amerinova, as in the *Coral* and *Hartley* cases. Because Amerinova owed the Debtor rent, the estate was diminished.

The Bank argues that it had a security interest in all of the assets of the Debtor, including the accounts receivable. Doc. No. 124, p. 25, ¶¶ 89-90. This is true, but does not overcome the fact that the transfer of this account receivable proceed was not authorized by the cash collateral order, and that any unauthorized transfer recoverable under chapter 5 would not be part of the Bank's postpetition lien. These transfers were neither part of the budgeted items approved for transfer, nor part of any of the Carve-Out Payments.

Accordingly, the May 1st $100,000 transfer and June 11th $50,000 transfer of Amerinova are avoidable as unauthorized transfers and recoverable by the Trustee.

### 3.   May 1st $205,000 Transfer by Discount Central

The postpetition transfer by Discount Central also represents an account receivable of the Debtor. The $205,000 was a refund generated by Mr. Guarino's cancellation of an order of tablets from Discount Central. He again improperly directed that Discount Central pay the refund to the Bank rather than to the Debtor. Discount Central did so, with a note "for Global Protection." Discount Central did not owe the Bank any money.

As with the account receivable of Amerinova, that the Bank had a security interest in the receivable does not change that the transfer was not authorized by the Cash Collateral Order. In addition, the Cash Collateral Order provides that unauthorized transfers would not be subject to the Bank's postpetition lien.

Accordingly, the May 1st $205,000 transfer by Discount Central to the Bank is avoidable and recoverable.

### 4.   Bank's Arguments as to All of the Postpetition Transfers

The burden now shifts to the Bank to show the validity of the transfers. Fed. R. Bank. P. 6001. The Bank makes several "omnibus" arguments in defense of avoidance of these payments. First, it argues that the spirit of the Cash Collateral Order was met, in that the Debtor had enough funds to pay certain expenses and administrative fees. Doc. No. 124, p. 24, ¶¶ 74-75. Therefore, "[a]t no point in time during active phase of the bankruptcy did Global lack money to pay bills." Doc No. 124, p. 14, ¶ 113. Whether the Debtor had $275,000 cash available on June 11, 2012 is

not relevant, it argues, as that condition of the Cash Collateral Order was premised on the Debtor needing money to continue operating, but the Debtor had ceased operating in May 2012. *Id.*, ¶ 76. It further asserts that it did not agree to the $275,000 cash cushion, and did not waive any rights to it. *Id.*, ¶ 77. Thus, the Bank argues, the only issue is whether any of the Debtor's undisputed budget items went unpaid. *Id.*, ¶ 78. The only item not paid was the California rent, but since it was disputed, it did not need to be paid. *Id.*, ¶¶ 79-83.[20]

Second, the Bank argues that the Cash Collateral Order did not specifically prohibit other payments. Doc. No. 124, p. 23, ¶ 72.

Third, the Bank argues that since section 549 does not prohibit transfers authorized by the court or by the Bankruptcy Code, and section 363(c)(2) allows for cash collateral to be used with the secured creditor's consent, its *post hac* consent to its use of cash collateral to pay down its prepetition claim prevents avoidance.

None of these arguments persuade the court. The Cash Collateral Order tightly controlled what transfers the Debtor could make: the budgeted items, and the Carve-Out Payments. This is belied by the language "the Cash Collateral may not be used for any other purpose, expense of administration of Debtor's estate or otherwise, and no expenses shall be paid or incurred by Debtor except for the expenditures set forth in the Budget and Carve Out Payments[.]" Ex. T-13, pp. 5-6. The Cash Collateral Order also clearly warned the Bank that proceeds from any actions under chapter 5—which of course includes section 549—would not be included in its security interest in postpetition assets or paid on its superpriority claim. Thus strict adherence to the provisions of the Cash Collateral Order was required, else the Bank might lost some of the collateral encompassed by its postpetition lien. Whether the Bank participated in negotiation of these terms, disagreed with them, or did not waive its rights to those monies, is immaterial in the face of the Cash Collateral Order entered by the court. If the Bank had issues with the terms of the order, it should have objected at the hearing held on approval of the interim order. It had an additional opportunity to object to the final order, and the extension, yet its only objection concerned the Debtor's compliance with the budget, not the chapter 5 provisions.

Moreover as an initial transferee, the Bank's knowledge or intent regarding unauthorized postpetition transfers is irrelevant, as the liability is strict. *In re M. Blackburn Mitchell Inc.*, 164 B.R. 117, 123 (Bankr. N.D. Cal. 1994) ("[T]he Code makes knowledge or culpability on the part of the *initial* transferee irrelevant to whether the transferee will be liable for returning transferred property to the estate.").

The Bank's attempt to retroactively consent to use of its cash collateral under section 363(c)(2) is inventive. However, the Cash Collateral Order did not provide for any other optional use of cash collateral by the Debtor. In making this argument, the Bank disregards that the Cash Collateral Order bound the Debtor, regardless of what the Bank might later want. In addition, the Creditors' Committee negotiated for the carve out from the Bank's cash collateral any claims or proceeds recovered from claims under Chapter 5. To allow the Bank this section 363 argument

---

[20] The Bank states in paragraph 80 "But that claim was undisputed during that entire period." The court assumes this is a typo.

would circumvent the intent of that provision, which likely was to restrict the Debtor's spending for the benefit of the estate.

Where a debtor-in-possession made an agreement with a bank regarding the extension of credit postpetition, with court approval, but the bank later additionally required crop insurance, and that any insurance benefits be paid to it on its claim, which requirements the debtors complied with, the court granted avoidance of the transfer pursuant to section 549, stating:

> It seems clear to this court that the postpetition transfer was without the court authority which is made necessary by § 549(a) of the Bankruptcy Code to legitimize it. The files and records in this case show with conclusivity that the agreement regarding insurance was never presented to the court for approval. The postpetition transfer was thus effected without the authority of the bankruptcy court and is therefore avoidable by the trustee under the provisions of § 549(a), *supra.* Our district court has made it clear that *advance* authorization of the bankruptcy court is necessary if postpetition payments are to be made on prepetition debts. *Matter of Isis Foods,* 37 B.R. 334 (W.D. Mo. 1983). Accordingly, the judgment must issue in favor of the plaintiff trustee in bankruptcy.

*Matter of Carlson,* 55 B.R. 124, 125 (Bankr. W.D. Mo. 1985) (footnotes omitted). *See In re Tom McCormick Enterprises, Inc.,* 26 B.R. 437, 440 (Bankr. M.D. Tenn. 1983) ("The court recognizes that the bank claims a security interest in the proceeds of its collateral deposited to the account. Nonetheless, the bank is not entitled to unilaterally appropriate the proceeds to partially satisfy its prepetition debt.") (footnote omitted). In other words, any deviation from the terms of the Cash Collateral Order could result in funds being recovered for the benefit of the estate rather than the benefit of the Debtor or the Bank.

The court also notes that the Bank did not make this section 363 argument in its pretrial brief or in closing, thus there was no notice to the Trustee.

The Bank also argued that it did not demand the payments made to it, was not consulted or notified in advance of the payments, and only learned about them after the fact. Doc. No. 124, p. 10, ¶¶ 75-77. If the Bank intended here to raise the section 550(b) good faith defense of an immediate or mediate transferee, it fails, as the court has already determined that the Bank was the initial transferee of these transfers. The court also notes that, though the Bank did not learn about the transfers until after they were accomplished, at least as to the May 1st transfers, that knowledge was gained very quickly, as Mr. Guarino sent Bank counsel an email on May 3rd alerting him to the transfers, and Debtor's counsel mentioned them at the May 10, 2012 hearing, including that the transfers might be outside of the language of the Cash Collateral Order.

Accordingly, this court holds that the $655,000 in unauthorized transfers are avoidable from the Bank and recoverable by the Trustee.

### D. Request For Attorney's Fees

#### 1.   Fees and Expenses for Late-Filed Expert Report

The Trustee seeks fees in connection with its motion filed earlier in this case seeking to exclude the Bank's expert report and testimony. Doc. No. 124, p. 78, ¶ 118. Though the court denied the motion, it did order that, as a sanction against the Bank for filing the report late, it would "consider awarding the Trustee its reasonable fees and expenses relating to that portion of the Motion" seeking to exclude the report and testimony. Doc. No. 57.

The Trustee submitted an expense report totaling $12,497.50 for 28.90 hours of work. Doc. No. 68-1. In response to an objection filed by the Bank, the Trustee states that estimating time was difficult because he needed to only include that time working on the motion that related to his argument about timeliness of the report. Accordingly, a total of 51.8 hours was reduced to 28.9 hours. In addition, he did not include the time appearing at the June 30, 2014 hearing on the matter.

The court previously determined that sanctions would be appropriate under 11 U.S.C. § 105. Sanctions pursuant to that section include actual damages incurred and reasonable attorney's fees. *In re Nowlin*, 04-08147, 2009 WL 2872916, at *5 (Bankr. M.D. Tenn. Aug. 27, 2009). A party seeking civil contempt must show by clear and convincing evidence that the offending party violated an order of the court. *Id.* In determining an appropriate sanction, the court should consider the goals of "compensation to the injured party, punishment and deterrence." *In re A.H. Robins Co., Inc.*, 133 F.3d 913 (4th Cir. 1998). The sanction "should be tailored to fit the particular wrong." *Topalian v. Ehrman*, 3 F.3d 931, 936 (5th Cir. 1993). Some courts apply the "reasonable and necessary" standard from section 330 to awards of attorney's fees pursuant to section 105. *See In re Plummer*, 513 B.R. 135, 148 (Bankr. M.D. Fla. 2014); *In re Zepecki*, 224 B.R. 907, 911 (Bankr. E.D. Ark. 1998). Overall, "reasonableness" in attorney's fees guides the sanction power. *See In re Montgomery*, CIV.A. 12 C 9328, 2013 WL 1943293, at *6 (N.D. Ill. May 7, 2013) (stating that will affirm sanctions unless they are contrary to law or reach an unreasonable result); *In re Ford*, 522 B.R. 842, 848 (Bankr. D.S.C. 2015) (awarding reasonable attorney's fees and costs in the amount of $8,500 for creditor's bad faith conduct in filing motion for stay relief five days after deadline); *In re Rosebar*, 505 B.R. 82, 89 (Bankr. D.D.C. 2014) (awarding reasonable fees for attorney's advising debtor to not appear at Rule 2004 examination); *In re Cutting*, 14-60309-7, 2015 WL 4331152, at *3 (Bankr. D. Mont. July 15, 2015) (awarding half the requested fees as reasonable, where attorney failed to file a billing statement with the court).

This court finds $12,497.50 excessive and unreasonable for the five pages of the Trustee's 24 page certification based on the lateness of the report. In addition, the Trustee counsel's time records include conferring with co-counsel and an excessive amount of time on research. Accordingly, the court will award reasonable fees to the Trustee in the amount of $2,000.

## 2. Fees and Expenses for Violation of the Cash Collateral Order and the Bankruptcy Code, Abuse of the Bankruptcy System, and Bad Faith

The Trustee seeks attorneys' fees and expenses for the Bank's "overt violation" of the Cash Collateral Order, proceeding under Bankruptcy Code section 105(a), Federal Rule of Bankruptcy Procedure 7054, and equitable exceptions to the American Rule. The Bank responds that the Trustee failed to properly allege this request in his complaint pursuant to Federal Rule of Bankruptcy Procedure 7008, and is not entitled to fees as a matter of law, citing the American Rule.

First, the court notes that Rule 7008 does not apply to requests for attorney fees or costs. Rule 7054 incorporates portions of Federal Rule of Civil Procedure 54 providing for award of costs and fees.

The American Rule provides that parties pay their own attorney's fees, unless a statute or contract provides otherwise. *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015). However, the Supreme Court has stated that "a court may assess attorneys' fees for the 'willful disobedience of a court order . . . as part of the fine to be levied on the defendant(,) . . . or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975).

The Trustee argues that the Bank acted in bad faith, vexatiously, wantonly, or for oppressive reasons by refusing to investigate whether the Cash Collateral Order was complied with, "forc[ing] a protracted litigation at the expense of the estate." Doc. No. 124, pp. 80-81, ¶ 122. But the Trustee's only argument is that the Bank did not voluntarily return the various transfers upon request. Though the court acknowledges that the Bank could have suspected that the transfers might be avoidable, the issues of initial versus immediate transferee determining the recoverability of the $500,000 preference, and the issues of property of the estate and interpretation of the Cash Collateral Order, show that there were some valid legal arguments to be made in defense. In addition, that the trial covered four days is as much the responsibility of the Trustee as of the Bank.

Accordingly, the court denies the Trustee's request for attorney fees and costs for this proceeding.

## CONCLUSION

Based on the foregoing, the court grants judgment in favor of the Trustee on the First and Fourth Counts. It denies the Trustee's request for attorney's fees and costs for this proceeding, but grants $2,000 as a sanction for the Bank's late production of its expert's report.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: February 26, 2016